CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

8/23/2024

LAURA A. AUSTIN, CLERK
BY   s/ S. MELVIN
       DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

**FELIPE CORREA**

*Plaintiff,*

v.

**THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINA, MALO A. HUTSON, in his individual and official capacity, and MEREDITH SMITH, in her individual and official capacity,**

*Defendants.*

Civil Action No. __3:24-cv-00065__

**JURY TRIAL DEMANDED**

Plaintiff Felipe Correa, by and through his attorneys, Nesenoff & Miltenberg, LLP, and Farmer Legal, PLLC, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York, 10001 and 5030 Sadler Place, #205, Glen Allen, Virginia, 23060, alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

### THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants The Rector and Visitors of the University of Virginia ("UVA" or "the University"), Malo A. Hutson, and Meredith Smith based on false allegations of violations of UVA's Sexual

1

Misconduct Policy, made by UVA against Plaintiff, Felipe Correa ("Plaintiff" or "Professor Correa").

2.      Plaintiff is an accomplished and respected architect and urbanist, department chair, author, publisher, lecturer and professor.

3.      Up until the wrongful actions by UVA, Professor Correa was employed at UVA's School of Architecture and held appointments as both Chair of the Architecture Department and a Full Professor with tenure.

4.      Plaintiff is an openly gay male.

5.      Motivated by discriminatory animus toward Plaintiff's sex and sexual orientation, UVA weaponized its Title IX office against Plaintiff by instituting a "Formal Complaint" against him based on purported violations of UVA's Title IX/Sexual Misconduct Policy.

6.      UVA's Title IX office instituted a "Grievance Process" against Plaintiff based on allegations that, even if proved true, would not constitute violations of UVA's applicable policy.

7.      From the inception of the false "reports" against Plaintiff, and throughout its so-called "Grievance Process," UVA exhibited discriminatory bias against Professor Correa as an accused gay male employee, and deprived him of his basic rights to a fair proceeding, including the right to be afforded a presumption of innocence and the opportunity to be heard by an impartial decision-maker.

8.      As a result of Defendants' discriminatory and unlawful conduct, Plaintiff Correa was forced to step down as Chair, forced to take an "administrative leave," suspended from all teaching responsibilities, restricted from all interaction with the UVA campus

and community, and eventually terminated from his tenured employment, in violation of the express terms of his employment contract.

9.      A non-exhaustive list of Defendants wrongful actions includes, *inter alia*, the following:

    a.  subjecting Plaintiff to invidious discrimination in his employment because of his sexual orientation;

    b.  purposefully instituting a "Formal Complaint" against Plaintiff based on allegations which, on their face, did not constitute violations of UVA's applicable Sexual Misconduct Policy;

    c.  failing to afford Plaintiff a fair and unbiased investigation;

    d.  subjecting Plaintiff to a "Grievance Process" in which the Investigator and Decision-Maker relied on irrelevant "evidence" concerning Plaintiff's sex and sexual orientation, including Plaintiff's personal use of Grindr (a social networking app for the LGBTQ+ community);

    e.  failing to dismiss charges against Plaintiff which, *even if proved true*, would not constitute "sexual harassment" under the applicable Sexual Misconduct Policy;

    f.  failing to afford Plaintiff a presumption of innocence;

    g.  failing to make any attempt to obtain and consider potentially exculpatory evidence requested by Plaintiff;

    h.  failing to apply the requisite preponderance of the evidence standard;

    i.  failing to interview relevant witnesses to corroborate his account of the events;

    j.  failing to respond to retaliatory conduct against Plaintiff;

    k.  breaching Plaintiff's right to privacy under UVA's applicable Sexual Misconduct Policy;

    l.  failing to expeditiously conduct the purported investigation in the specified time period;

    m.  retaliating against Plaintiff for defending against the erroneous and false accusations;

    n.  wrongfully forcing Plaintiff to step down from his appointed position as Chair of his department, based on false allegations; and

    o.  ultimately terminating Professor Correa from his tenured position based on false allegations, and without invoking the for-cause provision and without adhering to the required procedural protections afforded tenured faculty under the express terms of Plaintiff's appointment.

10.     Plaintiff therefore brings this action for relief based on causes of action for violations of Title IX of the Education Amendments of 1972, Title VII of the Civil Rights

Act of 1964, breach of contract, violation of the Fourteenth Amendment's Equal Protection Clause, and a violation of the Virginia Human Rights Act.

## **THE PARTIES**

11.     At all relevant times, Plaintiff was a resident of the Commonwealth of Virginia. He is currently a resident of the State of New York.

12.     At all relevant times, Plaintiff was an "employee" of the University of Virginia ("UVA"), as that term is defined by all applicable statutes and laws, including, *inter alia*, Title VII of the Civil Rights Act.

13.     Defendant, the Rector and Visitors of the University of Virginia, is the corporate board for the University of Virginia, a public corporation and an agency or instrumentality of the Commonwealth of Virginia.

14.     At all relevant times, UVA was Plaintiff's "employer" as that term is defined by all applicable statutes and laws, including, *inter alia*, Title VII of the Civil Rights Act.

15.     UVA is an employer located in Charlottesville, Virginia that at all relevant times employed more than 23,000 employees.

16.     UVA receives federal financial assistance.

17.     At all relevant times, Defendant Malo A. Hutson was the Dean of the School of Architecture at the University of Virginia.

18.     At all relevant times, Defendant Meredith Smith was the Title IX Coordinator at the University of Virginia.

**JURISDICTION AND VENUE**

19.     This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331–1332, 1367 because: (i) the federal law claim arises under the Constitution and statutes of the United States, (ii) the parties are citizens of different states, and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

20.     This Court has personal jurisdiction over Defendant UVA on the grounds that it conducts business within the Commonwealth of Virginia.

21.     This Court has personal jurisdiction over the Individual Defendants as their wrongful and unlawful actions at issue in this case took place in the Commonwealth of Virginia.

22.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

23.     Plaintiff exhausted his administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission and dual filing with the Virginia Human Rights Commission on February 13, 2024, alleging sex discrimination and retaliation in violation of Title VII (EEOC Charge No. 438-2024-00905).

24.     On July 26, 2024, Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission.

## FACTS

**I.** **Plaintiff's Professional Background and Employment at UVA.**

25. Plaintiff is a renowned architect and urbanist.

26. Professor Correa is an American of Ecuadorian national origin. He was born and raised in Quito, Ecuador, and moved in 1995 to New Orleans, Louisiana where he attended Tulane University and obtained a Bachelor of Architecture Degree.

27. Shortly thereafter, Plaintiff moved to Cambridge, Massachusetts, where he earned a Master of Architecture in Urban Design from the Graduate School of Design at Harvard University.

28. Plaintiff is the founder and managing partner of the design practice, Somatic Collaborative, through which he has designed and developed architectural and urban projects throughout the world.

29. Plaintiff has written a number of books and articles on architecture and urbanism, and has lectured and exhibited his work at leading universities and conferences throughout the world.

30. Between July 2012 and on or about July 2018, Plaintiff held a position at Harvard University as an Associate Professor of Urban Design.

31. After being recruited by UVA, Plaintiff left his position at Harvard University to accept a position as Chair of Architecture and an appointment as a Full Professor, without term, as a tenured member of the faculty in the Department of Architecture, effective July 25, 2018.

32.    Plaintiff moved his place of residence from Cambridge, Massachusetts to Charlottesville, Virginia to work at UVA.

33.    Under the terms of his May 15, 2018 appointment letter ("Appointment Letter"), Plaintiff's appointment to Chair was subject to a five-year term, subject to renewal with the dean of the School of Architecture's approval.

34.    Under the terms of Plaintiff's executed Appointment Letter, Plaintiff's tenured appointment as a Full Professor was "without term," and was "contingent on the granting of tenure and rank by the School of Architecture and UVA's Provost's office."

35.    On September 12, 2018, Plaintiff received notice of his tenure ratification from UVA.

36.    Plaintiff's Appointment Letter incorporated by reference the University's official policies.

37.    From July 25, 2018 through Spring 2022, Plaintiff served as UVA's appointed Architecture Department Chair while also serving as a tenured member of the faculty, and satisfactorily performed all of his duties associated with the administrative and teaching responsibilities of both appointments.

## II.    **Relevant Policies.**

38.    At all times relevant to the Complaint, the Office of the Executive Vice President and Provost maintained a published policy governing the Disciplinary Suspension or Termination of Academic Faculty ("For Cause Discipline Policy").

39.     Under the For Cause Discipline Policy, "[t]ermination of a faculty member's employment before the end of a specified term or after a faculty member has been granted tenure is rare, but possible."

40.     The For Cause Discipline Policy entitles a tenured professor to the invocation of adequate cause and specific, comprehensive procedures prior to the imposition of disciplinary suspension or termination. *See* For-Cause Discipline Policy at https://provost.virginia.edu/academic-policies/disciplinary-suspension-termination (last visited August 14, 2024).

41.     At all relevant times, UVA had in place a Policy titled HRM-041: Policy on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence ("Sexual Misconduct Policy").

42.     The Sexual Misconduct Policy prohibits "Sexual Harassment as defined by Title IX, which includes Quid Pro Quo Harassment, Sexual Harassment, Sexual Assault, Dating Violence, Domestic Violence, and Stalking on the basis of sex in an education program or activity," (collectively referred to as "Title IX Prohibited Conduct"). The procedures ("Grievance Process") for reporting, investing, and adjudicating Title IX Prohibited Conduct are outlined under "Appendix A" to the Sexual Misconduct Policy.

43.      The Sexual Misconduct Policy also prohibits so-called Sexual or Gender-Based Prohibited Conduct ("SGBP Conduct"). SGBP collectively refers to the following specifically defined forms of conduct: "Quid Pro Quo Harassment, Sexual or Gender-Based Hostile Environment Harassment, Non-Consensual Sexual Contact, Non-

Consensual Sexual Intercourse, Sexual Exploitation, Intimate Partner Violence, [and] Stalking." Sexual Misconduct Policy, Part IV.B.

44.      The procedures ("Grievance Process") for reporting, investing, and adjudicating SGBP Conduct are outlined under "Appendix B" to the Sexual Misconduct Policy.

45.      Under the Sexual Misconduct Policy, all forms of prohibited conduct are unwelcome. *Unwelcomeness* is, thus, an indispensable element of any violation of the Sexual Misconduct Policy, whether categorized as Title IX Prohibited Conduct or SGBP Conduct.

**III.  False Allegations and Title IX Proceeding.**

**A.  March 23, 2018: the SAM list.**

46.      On or about March 23, 2018, before starting his employment at UVA, an anonymous crowdsourced spreadsheet called the "Shitty Architecture Men" list ("SAM List"), began circulating online.[1]

47.      The SAM List included hundreds of names of individuals in the field of architecture whom the anonymous source claimed had committed acts of sexual misconduct.

48.      Plaintiff's name was included on the SAM List, with vague and false allegations that he had subjected students to "sexual harassment, inappropriate contact, inappropriate conduct, unequal treatment of students," and "doesn't like to work with female students."

49.      The SAM List indicated that the allegations against Plaintiff were based solely on unverified "allegations and rumors."

---

[1] *See* https://www.archpaper.com/2018/03/shitty-architecture-men-list-address-abuse-in-architecture/

50.     UVA was aware of the SAM List prior to hiring Plaintiff.

51.     At the request of UVA, on March 27, 2018, Plaintiff wrote to Ila Berman, then dean of the UVA School of Architecture, refuting the false allegations in the SAM List.

52.     UVA conducted its own background check, in which female and male architectural professionals, including Plaintiff's colleagues and students, refuted the allegations.

### B. March 2022: Dean Hutson Forces Plaintiff to Resign as Department Chair, and files two false reports against him with the Title IX Office.

53.     During the fall of 2020 through the spring of 2022, Plaintiff accessed and subscribed to a dating website called Grindr, a social networking app for gay, bi, trans, and queer people.

54.     Upon information and belief, senior university administrators including Dean of the School of Architecture, Malo A. Hutson ("Hutson" or "Dean Hutson") had heard rumors regarding Plaintiff's reported use of Grindr.

55.     Upon information and belief, Dean Hutson spoke with Provost Liz Magill ("Magill")[2] regarding this purported concern in or around January of 2022. Provost Magill indicated that they should "monitor the situation," referring to Plaintiff's use of Grindr.

---

[2] Magill resigned from her position as President of the University of Pennsylvania in December 2023, amid criticism and rising pressure related to testimony provided during a congressional hearing, where she addressed rising antisemitism on campus and whether certain acts would violate the school's conduct policies. *See https://www.nytimes.com/2023/12/09/us/university-of-pennsylvania-president-resigns.html*

56.     Upon information and belief, also in January of 2022, graduate student JH[3], who would later become the subject of one of the complaints against Plaintiff, told ES[4], another graduate student, that Plaintiff was going to be leaving the institution.

57.     Less than two months later, on March 2, 2022, Plaintiff was called into the office of Dean Hutson. To Plaintiff's complete shock and confusion, and without any prior warning, Dean Hutson asked Plaintiff to step down from his position as Chair at the end of the semester.

58.     Oddly, in exchange for Plaintiff's agreement, Dean Hutson offered Plaintiff three years of summer salary, additional research funds, the ability to teach classes of his choosing upon his return, and a full year of sabbatical.

59.     On March 4, 2022, Plaintiff met with Dean Hutson once again via Zoom. When Plaintiff asked for an increase in the offered base salary, given the impact the forced resignation would have on his career, Dean Hutson began shouting at Plaintiff and told him that if he did not sign the agreement to step down, "it would get much worse" for him (Plaintiff).

60.     Thus, Plaintiff complied with Dean Hutson's demand and signed the agreement on March 5, 2022, despite his confusion and objection, and without justification from Dean Hutson, due to his fear for his continued employment.

61.     Upon information and belief, when Dean Hutson urged Professor Correa to step down from his position, he was aware of false allegations of sexual misconduct against

---

[3] JH is a pseudonym.

[4] ES is a pseudonym.

Plaintiff. On March 23, 2022, Dean Huston filed two so-called "reports" against Plaintiff based on the false allegations with UVA's Title IX office.

62.     On or about March 29, 2022, Dean Hutson, Meredith Smith ("Smith"), UVA's Title IX Coordinator, Jennifer Harmon, a Human Resources official, and Jamie Saterlee, Hutson's assistant, met with Plaintiff and gave him a choice: he could either be placed on "interim suspension" or go on a "voluntary administrative leave."

63.     When Plaintiff requested some time to think about the decision, he was told that he only had until noon the next day.

64.     Either way, Plaintiff had no choice. Effective immediately, without warning or opportunity to object, Plaintiff was prohibited from being on the grounds of UVA or communicating with the UVA community (in person or virtually).

65.     Plaintiff's ban from campus substantially diminished his capacity to conduct research. Plaintiff's forced "administrative leave" also resulted in the indefinite postponement of a forthcoming publication and an exhibition on Collective Housing, a book project on cities and urbanization in the Amazon Rainforest, and a planned retrospective that had been scheduled of his work at the University of Texas, in Austin.

66.     On March 30, 2022, Hutson sent an email to the entire School of Architecture, (*not just* Plaintiff's department), announcing that Plaintiff had been placed on administrative leave, removed as Department Chair, banned from campus, and prohibited from participation in UVA online courses and virtual events.

67.     The last line of Dean Hutson's email read, "[w]e are working together to support our community and, most importantly, to ensure the wellbeing of our students." This last

line implied wrongdoing by Plaintiff that threatened students' safety, even before UVA had begun any investigation, and prompted harmful rumors about Plaintiff, both inside and outside UVA.

68.     Plaintiff's colleagues forwarded Plaintiff a copy of Dean Hutson's email and expressed to him their alarm at the implications of Hutson's message.

69.     Within days of Dean's Hutson's email, Plaintiff's Wikipedia entry was maliciously edited by anonymous users, whose IP addresses tied back to Charlottesville and the University of Virginia's servers, which falsely stated that Plaintiff had been removed from UVA's faculty.

70.     Following the email, Plaintiff's invitations to give lectures, formerly two or three per semester, shrunk to zero.

71.     Dean Hutson's email has resulted in irreparable harm to Plaintiff's professional reputation, and the fallout continues through the present day.

### C. April 4, 2022: Notice of Allegations and Investigation.

72.     On or about April 4, 2022, Plaintiff received a Notice of Allegations and Investigation ("NOAI") from the Office of Equity and Inclusion ("OEI").

73.     The NOAI stated that Plaintiff had been named as a respondent in a Title IX complaint due to alleged violations of the Sexual Misconduct Policy based on allegations reported to Dean Hutson by two male graduate students in the School of Architecture, TK[5] and JH.

---

[5] TK is a pseudonym.

74.     The NOAI falsely alleged that TK and JH had, respectively, been sexually assaulted and sexually harassed by Plaintiff.

75.     The allegations contained in the formal complaint filed by UVA in Spring 2022 were suspiciously like the accusations contained in the SAM List which had never been acknowledged or verified by any reliable source, and which were directly refuted by Plaintiff and others falsely accused.

76.     Plaintiff knew that TK and JH were friends as well as roommates, and would later learn that both had been urged to speak with Dean Hutson by their mutual friend, CB, as well as BN[6], TK's girlfriend. CB and BN were both female graduate students in the School of Architecture.

77.     When CB met with Dean Huston concerning TK and JH, CB made clear her perception that she and other women did not have a "voice" in the School of Architecture.

78.     Shocked and appalled by the allegations set forth in the NOAI, Professor Correa immediately engaged an advisor to support him in the process.

79.     Though JH and TK had made their reports to Dean Hutson, they declined to file a formal complaint with the Title IX office.

80.     Consequently, on or about March 23, 2022, Dean Hutson filed two separate reports with UVA's Title IX office, one concerning JH and the other concerning TK.

81.     The Title IX office combined the two matters into a single "Formal Complaint" against Plaintiff.

---

[6] CB and BN are both pseudonyms.

82.     The NOAI indicated that "[t]he Title IX Coordinator determined it necessary to file a Formal Complaint on the behalf of Complainant JH and Complainant TK and initiate a Formal Resolution pursuant to the Grievance Process."

83.     The NOAI advised Plaintiff that his alleged conduct implicated violations of the "Sexual Misconduct Policy" and "other, related policies," and listed the following policies to be at issue:

(1) Quid Pro Quo Harassment (Title IX Prohibited Conduct)
(2) Sexual Harassment (Title IX Prohibited Conduct)
(3) Sexual and/or Gender-Based Hostile Environment Harassment (Sexual or Gender-Based Prohibited Conduct, hereinafter "SGBPC")
(4) Faculty Conflict of Interest Policy
(5) Provost Policy

84.     Notably, the Conflict of Interest Policy and the Provost Policy both regulate consensual sexual relationships.

85.     The Sexual Misconduct Policy charged the Title IX Coordinator and/or their designees with responding to Title IX Prohibited Conduct and SGBP Conduct.

86.     Although the NOAI listed the Faculty Conflict of Interest Policy and the Provost Policy as "related policies," UVA's Title IX office had no authority or jurisdiction to respond to alleged violations of either the Faculty Conflict of Interest Policy or the Provost Policy.

87.     The Title IX office therefore lacked authority or jurisdiction to open complaints based on alleged violations of the Conflict of Interest Policy and/or the Provost Policy, or to investigate or adjudicate alleged violations of these policies.

88.     The NOAI further informed Plaintiff that the Title IX office had designated Amanda Ames as the investigator ("Ames" or the "Investigator").

89.     On the face of the allegations set forth in the NOAI, JH indicated that he had engaged in consensual sexual encounters with Plaintiff.

90.     JH alleged that, in August 2020, before enrolling as a graduate student in the School of Architecture and unaware of Plaintiff's affiliation with UVA, he sent Plaintiff nude photos of himself via Grindr, which Plaintiff did not reciprocate. JH further alleged that, after enrolling as a graduate student in the School of Architecture, he had consensual sexual encounters with Plaintiff in February and March 2021.

91.     As noted, sexual conduct must be unwelcome to constitute a violation of the Sexual Misconduct Policy. Under its own policy and procedures, the Title IX office should therefore never have opened a Formal Complaint based on JH's allegations.

92.     In contrast, TK alleged that, between the summer of 2021 and November 2022, in the course of his professional and academic activities, Plaintiff had touched TK's shoulder, back, and abdomen, conduct which TK perceived to be both unwelcome and inappropriate.

93.     On the face of the allegations, TK's alleged conduct that was not based on TK's sex, nor was it sufficiently severe, pervasive and offensive to meet the definition of "sexual harassment," under the Sexual Misconduct Policy (either the "Title IX Prohibited Conduct" definition or the "SGBP Conduct" definition).

94.     On April 15, 2022, Plaintiff wrote to Meredith Smith, UVA's Title IX Coordinator, to request that the Title IX office bifurcate the two matters involving TK and JH, and handle them as two separate complaints, with two separate investigations.

95.     In his April 15 letter, Plaintiff explained that combining the two matters in a single complaint would unfairly prejudice him in the ensuing Grievance Process. Plaintiff wrote:

Although the institution's Title IX Policy states that several policies may be included in one investigation, the policy does not dictate that when there is more than one complaint against the same respondent that they will be joined and considered as part of the same investigation. Joining these two complaints together does not allow for an unbiased investigation and it is likely the existence and or facts of each of the cases will affect the other and result in any hearing panel to issue an unbiased and independent decision without being influenced by the facts of the other complaint, or even by the fact that another complaint exists.

96.     In a letter dated April 20, 2022, Deputy Title IX Coordinator and Director of Investigations Charlote Breen ("Breen") responded to Plaintiff, denying his request to treat the JH and TK matters as two separate complaints.

97.     Although Breen responded that she "understood" Plaintiff's "concerns about the potential for prejudice in combining these matters," she erroneously asserted that "a single investigation [was] appropriate" because "the facts alleged are substantially related to each other, in both timing and content."

98.     Breen's response was plainly wrong.

99.     The allegations made by the JH and TK, as set forth in the NOIA were dissimilar in timing and content, and implicated different issues and policy provisions.

17

100.    And, as noted, while TK alleged conduct that he perceived to be both inappropriate and unwelcome, JH did not even allege conduct that was unwelcome, an indispensable element of any violation under the Sexual Misconduct Policy.

101.    On April 27, 2022, Plaintiff renewed his request for bifurcation of the two matters, and also asked that the Investigator be removed and that two new investigators be assigned, one for each complaint, to avoid potential prejudice.

102.    On or about April 29, 2022, the Title IX office again denied Plaintiff's request to bifurcate the processing and investigation of the matters as two separate complaints.

103.    The Title IX Coordinator again disregarded Plaintiff's right to an impartial investigator and decision maker. Smith asserted in conclusory fashion that it was "untenable to attempt to segregate the reports after the fact" because JH and TK "are known to each other, aware of each other's allegations, and made their reports to the same University administrator contemporaneously."

104.    The Title IX Coordinator exhibited her bias against Plaintiff when she failed to investigate and process two formal complaints separately for TK and JH.

105.    The Title IX coordinator's biased decisions in the processing and investigation of the allegations resulted in bias by the Investigator and subsequent bias by the decision maker, who would consider the "totality of the evidence," and a purported "pattern" of so-called "multiple complainants" in arriving at his findings and conclusions, as well as sanctions.

IV. **December 9, 2022: UVA's Draft Investigation Report: Indicia of Discriminatory Bias.**

106.    On December 9, 2022, Ames published a draft investigation report (the "Draft Report").

107.    A chief focus of Ames's Draft Report was Plaintiff's personal use of Grindr.

108.    Investigatory interviews of witnesses by Ames revealed that, among the Complainants JH and TK and their peers in the School of Architecture, as well as the administration, Plaintiff's presence on Grindr had caused suspicion and distrust.

109.    In his interview with Ames, Dean Hutson expressed that UVA administrators had shared concerns about Plaintiff's reputed presence on Grindr.

110.    Dean Hutson indicated that he had opportunities to see Plaintiff interact with students, including social events, studio reviews (where students' work is critiqued), and that he had never observed anything he thought was inappropriate in Plaintiff's interactions with students.

111.    However, Hutson told the Investigator that he had raised concerns to UVA's provost that Plaintiff's presence on Grindr "had made a student uncomfortable."

112.    According to Dean Hutson, the provost told him that they should "monitor the situation," but would not "dive into people's personal lives unless we know there's something inappropriate or anything like that."

113.    With respect to JH's allegations, JH told the Investigator that, in August 2020, he and Plaintiff had a brief exchange on Grindr, prior to JH enrolling as a graduate student in the School of Architecture.

19

114. No UVA policy was implicated by this exchange on Grindr.

115. However, Ames, with the Title IX office's oversight, evidently believed that Plaintiff's personal use of Grindr was indicia of sexual misconduct or otherwise relevant to the allegations against Plaintiff.

116. Plaintiff was shocked to see that Ames had included in her Draft Report a photograph of Plaintiff's personal profile on Grindr, attached as a purported "exhibit" with the "evidence" provided by JH.

117. Plaintiff's personal use of Grindr, like the screenshot of his personal profile on Grindr, did not corroborate JH's allegations, as it neither demonstrated that Plaintiff had communicated with JH on Grindr or that Plaintiff had ever had a sexual relationship with JH.

118. Plaintiff's use of Grindr and his personal profile on Grindr were not relevant to any fact or issue in Plaintiff's Title IX proceeding.

119. The Title IX office's sole purpose in admitting evidence relating to Plaintiff's use of Grinder into the record was to demonstrate that Plaintiff was an openly gay male, and to subject Plaintiff to discriminatory animus based on negative stereotypes.

120. In this manner, Title IX office subjected Plaintiff to discriminatory sexual stereotypes associated with his sex and gender, perpetuating the apprehension of UVA administrators toward Plaintiff's presence on Grindr and his protected status as a gay male.

121.    On information and belief, no heterosexual respondent has similarly been subjected to suspicion based on use or membership of comparable social networking sites utilized in the heterosexual community, such as Match.com or Tinder.

122.    In accordance with the Sexual Misconduct Policy, Plaintiff submitted a response to the Draft Report on January 20, 2023, in which he both affirmed his innocence and highlighted the numerous factual inconsistencies in the Complainants' allegations.

123.    Plaintiff also correctly pointed out that, whatever brief communication he and JH had over Grindr in August of 2020, it was irrelevant to any of the issues in dispute.

124.    Plaintiff noted that the Grindr communication between himself and JH, which occurred in August 2020, was before JH started graduate school, and represented nothing more than a consensual, brief online exchange between two adults.

125.    Moreover, it was undisputed that the August 2020 exchange on Grindr did not lead to or involve a sexual encounter between JH and Plaintiff.

### A. Other Indicia of Bias in the Investigator's Draft Report.

126.    Statements by TK, JH, and other witnesses interviewed and highlighted by Ames in her Draft Report were replete with negative stereotypes directed at Plaintiff's status as a gay male.

127.    Plaintiff's fundamental job responsibilities as Chair of the Department of Architecture included attending reviews of students' work (critiqued by architecture faculty who function as critics, in a public setting), and encouraging all students to apply for professional opportunities.

128.    JH and TK, and witnesses interviewed by Ames, characterized these neutral functions of a department chair, when performed by Plaintiff, as somehow predatory, and as having targeted or singled out JH and TK.

129.    These mischaracterizations of Plaintiff's job functions, which were replete in the Draft Report and were the basis for the allegations themselves, were based on nothing more than these individuals' personally held negative stereotypes and bias toward Plaintiff's status as a gay male.

130.    In Plaintiff's response to the Draft Report, Plaintiff urged the Investigator to seek out all applications for and selection of interns to work on research projects, and to interview departmental witnesses who could explain to Ames that it was *normal* for Plaintiff, as Chair of the Architecture Department, to attend reviews of *all* students' studio work.

131.    Plaintiff also pointed out that Ames's Draft Report repeated the unsubstantiated and prejudicial statements of CB, (a female graduate student in the School of Architecture), who allegedly "warned" TK that he should *"be wary of working for [Plaintiff]."*

132.    Ames accepted at face value CB's false and prejudicial statement that Plaintiff *"like[d] to have a chosen one,"* despite that this statement was unsubstantiated by any facts.

133.    When Ames interviewed CB, CB provided no factual basis whatsoever for her damaging statements. However, Ames did not highlight or address the lack of factual support for CB's prejudicial statements in her Draft Report.

134.    Ames accepted CB's statements at face value, summarizing and highlighting CB's unsubstantiated and prejudicial remarks, as repeated to Complainant TK, in the Draft Report as though they were factually supported and relevant to demonstrate sexual misconduct by Plaintiff.

135.    Ames further demonstrated her bias by failing to include in her Draft Report, CB's and other witnesses' statements that demonstrate that CB possessed no personal knowledge of any allegedly sexually inappropriate conduct by Plaintiff toward TK, JH, or any other student.

136.    Ames also demonstrated her bias by failing to highlight and summarize in her Draft Report statements by CB and other witnesses demonstrating that CB was the individual who had instigated TK and JH's meeting with Dean Huston, because she felt Plaintiff had failed to pay sufficient attention or respect to her own studio work and perceived Plaintiff to be dismissive of her input during a group discussion at the School of Architecture.

137.    Plaintiff filed his response to the Draft Report on or about January 20, 2023, raising the aforementioned concerns and again requesting that the Investigator be replaced due to issues of prejudice and bias, exacerbated by the consolidation of the TK and JH complaints.

138.    Plaintiff's request to replace the Investigator was denied by the Title IX office.

139.    Plaintiff also contemporaneously filed complaints against UVA and the other parties in interest for retaliation, which UVA ignored and never investigated.

140.    Plaintiff's complaints of retaliation included conduct by UVA and malicious acts which, on information and belief, were committed by the Complainants, including:

- On March 4, 2022: Plaintiff was warned to step-down as Chair or else things would "get worse."

- On March 28, 2022: Plaintiff was removed from campus.

- On March 30, 2022: Hutson sent a school-wide email announcing Plaintiff's step-down as Chair and his leave status.

- On May 2, 2022: Anonymous users with IP addresses located in Charlottesville modified Plaintiff's Wikipedia entry, falsely stating that Plaintiff had been removed as a faculty member and linking to malicious comments that Plaintiff "was fired, lmao."

- On August 19, 2022: On August 19, Hutson notified all faculty that they would receive this pay raise effective at the end of the month. Plaintiff was denied a merit salary increase to which he was entitled.

141.    However, UVA disregarded his request and failed to investigate these concerns.

**B.      On or about March 2023: Placing Professor Ripple into Plaintiff's Office Space.**

142.    On or about March 23, 2023, UVA moved Plaintiff's belongings out of the office reserved for the Chair of the Department and reallocated his office space without notifying him.

143.    After UVA elevated Professor Jeana Ripple ("Professor Ripple") to the position Plaintiff formerly held as Chair, UVA moved Professor Ripple into the exact same office space that Professor Correa formerly occupied as Chair.

144.    This action, which demonstrated a presumption of responsibility prior to any finding, is prohibited under the Title IX Regulations and against UVA's own policies.

### C. June 9, 2023: Final Investigation Report.

145.   Six months later, on or about June 9, 2023, Ames issued a final investigation report ("Final Report").

146.   In her Final Report, Ames retained and summarized all the testimony and "evidence" provided by JH and TK, and accepted the truth of their testimony unquestioningly, as she had done in her Draft Report.

147.   The Title IX office provided the Final Report to the Decision-Maker for his consideration, inclusive of the non-probative, prejudicial testimony of JH and a photo of Plaintiff's Grindr profile.

148.   Under the Sexual Misconduct Policy's applicable procedures, the timeframe for the completion of an investigation, "the period from commencement of an investigation through resolution (finding and sanction) will not exceed 90 business days." Appendix A at VII.D.2; Appendix B at VII.D.2.d.

149.   In Plaintiff's case, for none of the reasons authorizing an extension for "good cause" under the Grievance Process, UVA's investigation lasted 295 business days, more than three times longer than it was supposed to take.

150.   In her Final Report, Ames made the following non-binding recommendations regarding responsibility for alleged violations of UVA policies:

- that there was *insufficient* evidence to support findings of responsibility for:
    - Quid Pro Quo Harassment (Title IX Prohibited Conduct)
    - Sexual Harassment (Title IX Prohibited Conduct)

- that there was sufficient evidence to support findings of responsibility for:
    - Sexual and/or Gender-Based Hostile Environment Harassment (SGBH Conduct) — *as to TK only*

25

• Faculty Conflict of Interest Policy – *as to both TK and JH*
• Provost Policy 033: Restrictions on Certain Romantic or Sexual Relationships at the University – *as to JH only*

**D.  The Investigator's recommendations regarding alleged policy violations.**

151.    In her Final Report, the Investigator recommended that there was insufficient evidence that Plaintiff engaged in prohibited Title IX Prohibited Conduct under the Sexual Harassment Policy.

152.    The Investigator noted that JH had welcomed conduct on the basis of sex, and so therefore could not state a violation under the Sexual Misconduct Policy.

153.    As to TK, the Investigator noted that no reasonable person would find that his alleged conduct was so "severe, pervasive, and objectively offensive" as to deny him access to UVA's educational programs. The Investigator noted that, "given the location of" the alleged touching (on TK's "non-intimate" body parts), "the conduct . . . was not severe."

154.    However, for purposes of SGBH Conduct, the Investigator recommended that there was sufficient evidence to hold Plaintiff "responsible" because the applicable policy definition required only that the conduct be "sufficiently severe, persistent, *or* pervasive."

**E.  In excess of her authority, the Investigator made recommendations regarding the Provost Policy 033 and the Faculty Conflict of Interest Policy.**

155.    The Investigator was only charged with investigating alleged Title IX Conduct and SGBH Conduct, and related policies implicating discrimination. *See* Sexual Misconduct Policy, Section I.

156.    Ames had no jurisdiction to make recommended findings of alleged violations of either the Faculty Conflict of Interest Policy or the PROV-033: Restrictions on Certain Romantic or Sexual Relationships at the University," ("Provost Policy 033").

157.    With no authority to do so, the Investigator recommended that there was sufficient evidence to find that Plaintiff had violated the Conflict of Interest Policy as to both TK and JH.

158.    With no authority to do so, the Investigator also recommended that there was sufficient evidence that Plaintiff had violated the Provost Policy 033.

159.    UVA promulgated the Provost Policy 033 on October 11, 2021. The policy prohibits romantic and sexual relationships between faculty and students and requires faculty to recuse themselves from academic and supervisory responsibility over such student.

160.    The Provost Policy 033 provides that, for faculty, "knowingly violating the prohibition with respect to undergraduate students shall be deemed misconduct as described in the Policy on Disciplinary Suspension or Termination of Academic Faculty [the For-Cause Discipline Policy]."

161.    The policy does not contain any express sanctions for violations involving graduate students.

162.    Provost Policy 033 was not in effect at the time of alleged consensual sexual activity between JH and Plaintiff.

163.    JH was never Plaintiff's student or teaching assistant or research assistant, and Plaintiff had no apparent supervisory role over JH from which he could recuse himself.

164.     To the extent that the Provost Policy 033 applies to Plaintiff's alleged conduct, the policy does not supersede or abrogate the procedural protections afforded him as a tenured professor under the For Cause Discipline Policy.

165.     The Conflict of Interest Policy is a broad policy that makes it the responsibility of faculty to avoid conflicts of interest, including "engaging in sexual relationships with or making sexual overtures to students over whom they are in a position of authority." https://provost.virginia.edu/academic-policies/conflict-interest-faculty.

166.     Pursuant to the Sexual Misconduct Policy, Plaintiff did not accept the Investigator's recommendations, and a hearing was scheduled for September 5, 2023.

167.     On or about September 19, 2023, Plaintiff received a written determination published by Attorney Christopher Tate, (which was oddly dated one month prior for August 17, 2023), who served as the Decision Maker in the Grievance Process.

168.     In his decision, the Decision Maker made the following findings:

There was **insufficient** evidence to find Plaintiff responsible for:
- Quid Pro Quo Harassment – *JH and TK*
- Sexual Harassment (Title IX Prohibited Conduct) – *JH only*
- Sexual and Gender-Based Hostile Environment Harassment -- *JH and TK*
- Provost Policy 033 – *TK only*

There was **sufficient** evidence to find Plaintiff responsible for:
- Sexual Harassment (Title IX Prohibited Conduct) – *as to TK*
- Faculty Conflict of Interest Policy-- *JH and TK*
- Provost Policy 033 – *as to JH.*

169.     Referring to Title IX Sexual Harassment (the three-pronged definition of "Title IX Prohibited Conduct" under the Sexual Misconduct Policy), the Decision Maker

28

acknowledged in his written decision that **"[u]nwelcomeness is an indispensable element of any violation of this policy definition."** Hearing Decision at 15.

170.    Finding that "there was insufficient evidence to show that any sexual conduct between [Plaintiff] and Complainant JH was unwanted," the Decision Maker concluded that Plaintiff was not responsible for either Title IX Prohibited Conduct or SGBH Conduct as to JH.  Hr'g Tr. Decision at 11, 14-15, 18.

171.    However, as to TK, the Decision Maker inappropriately disregarded the legal standard for Title IX Sexual Harassment, which required that conduct be *based on sex* and objectively *"so severe, pervasive, and offensive"* as to effectively deny access to the University's educational program. Instead, the Decision Maker accepted TK's subjective perception that Plaintiff's alleged touching of TK's non-intimate body parts was "unmistakably sexual in nature."

172.    TK's allegations defied credibility. Although TK's alleged misconduct by Plaintiff had purportedly occurred in the studio environment at UVA and other public spaces over a timespan lasting many months, no eyewitnesses corroborated his allegations.

173.    The Decision Maker's finding that there was sufficient evidence of Title IX Sexual Harassment was based *solely* on TK's word that he subjectively "perceived" Plaintiff's alleged touching to be "flirtatious in nature."

174.    Under the Sexual Misconduct Policy, as under Title IX, a respondent is not required to submit to questioning by the Investigator, and no adverse inference shall be drawn from a respondent's decision not to submit to questioning.

175.    Plaintiff did not submit to questioning by the Investigator, as was his right under the Sexual Harassment Policy, but he otherwise fully participated in the Title IX proceeding.

176.    Throughout the entire Grievance Process, Plaintiff provided detailed context and explanations of his conduct in response to TK's allegations, including in his written responses to the Draft Report, and to supplemental information obtained by the Investigator.

177.    Plaintiff also provided detailed opening and closing statements at the hearing, in which he specifically denied touching TK.

178.    Reflecting the Decision Maker's bias against Plaintiff, the Decision Maker repeatedly characterized Plaintiff's many specific denials and detailed responses to TK's allegations as a "*bare denial*" to which the Decision Maker indicated he had assigned "*limited weight.*" Hearing Decision at 11, 13.

179.    The Decision maker's mischaracterizations of Plaintiff's responses and specific denials as a "bare denial" reflects his bias against Plaintiff and that he simply accepted TK's word over that of Plaintiff.

180.    In addition, the Decision Maker's conclusion as to TK was based on his erroneous presumption that TK was but one of "multiple" complainants.

181.    Incredibly, the Decision Maker also found "sufficient evidence, by a preponderance of the evidence, to conclude that Plaintiff had engaged in *"severe"* "sexual harassment" under UVA's Title IX policy with respect to TK.

182.    The Decision Maker also exceeded his authority and jurisdiction by finding violations of the Faculty Conflict of Interest Policy as to both TK and JH on the basis of Plaintiff's alleged "sexual relationship" with JH and his purported "sexual overtures" to TK.

183.    The Decision Maker also exceeded his authority by finding a violation of Provost Policy 033 on the basis of Plaintiff's failure to recuse himself from "supervising" JH when he allegedly had a prior "sexual relationship" with him. However, it was undisputed that JH had never been in any of Plaintiff's classes and was never Plaintiff's teaching or research assistant.

184.    The written determination letter recommended the following sanctions upon Plaintiff: **termination of employment, with no eligibility for rehiring**.

185.    The Decision Maker's finding that Plaintiff was responsible for Title IX prohibited conduct involving T.K. reflected the Decision Maker's bias, as it was based on nothing more than TK's alleged *perception* that Plaintiff had intended to be flirtatious, and the Decision Maker's presumption that TK was one of "multiple" "complainants."

186.    Both JH and TK had declined to file a report with the Title IX office or to sign a formal complaint. The complaint had instead been signed by Smith, in her capacity as the Title IX Coordinator, causing the University to act as the complainant in the case against Plaintiff.

187.    Throughout his biased written decision, the Decision Maker referred to JH and TK as "multiple complainants."

31

188.   Specifically, the Decision Maker assigned "great weight to the fact that Respondent's behavior affected multiple Complainants. Evaluating their cases separately, each case would be sufficient, on its own, to warrant a significant sanction. Had the cases proceeded through formal resolution on their own, Respondent's responsibility for one case would have been considered . . . as prior misconduct. Moreover, the pattern represented by Respondent's conduct towards these Complainants is profoundly concerning, and strongly favors removal from the University." Hrg' Decision at 24-25 (Emphasis added).

189.   The Decision Maker's decision on sanctioning was inappropriate.

190.   The Decision Maker opined in his decision that consensual conduct is a *required element* of every applicable violation under the Sexual Harassment Policy (both Title IX Sexual Harassment and non-Title IX SGBH).

191.   Importantly, JH alleged sexual conduct that was *welcomed.*

192.   Pursuant to the Sexual Misconduct Policy, JH's matter should have been dismissed from the outset by UVA's Title IX office, because *unwelcome* conduct is an essential element of the policy.

193.   The Title IX office should therefore never have opened a "Formal Complaint" based on JH's report because his allegations, even if proved true, did not constitute violations of UVA's Sexual Harassment Policy.

194.   If JH's "complaint" had been properly dismissed by the Title IX office, UVA's Decision Maker would never have been permitted to consider JH's case in the context of

determining sanctions in TK's matter because his allegations did not implicate a violation of the Sexual Misconduct Policy.

195.    The only UVA policies implicated by JH's allegations were UVA's Conflict of Interest Policy and its Provost 033 Policy, over which the Title IX office and its Decision Maker had no subject matter jurisdiction.

196.    Accordingly, to the extent that JH's and TK's matter had proceeded in a bifurcated grievance process, JH's matter would properly have been promptly dismissed.

197.    Accordingly, the Decision Maker would have had no authority or jurisdiction to consider JH's allegations when arriving at the sanctions in TK's matter.

**F.  Plaintiff's Appeal of the Decision-Maker's Written Decision.**

198.    On or about October 10, 2023, Plaintiff filed an appeal of the Decision Maker's findings and recommended sanctions to the provost.

199.    In accordance with UVA's Sexual Misconduct Policy, Plaintiff based his appeal on three grounds: (1) procedural irregularity affecting the outcome; (2) bias of the Title IX Coordinator, investigator, or respondent; and (3) inappropriate disciplinary action. Plaintiff made numerous arguments on all three grounds.

200.    With respect to the first ground, Plaintiff argued that the Title IX office lacked jurisdiction to evaluate conduct under either the Conflict of Interest Policy or the Provost Policy, neither of which fell under its authority. Plaintiff noted that, "lump[ing] these alleged policy violations into a Title IX investigation processes was an extraordinary violation of [his] civil rights in an apparent attempt to submit [Plaintiff] to multiple layers of administrative processes" to ensure that UVA could hold him "responsible."

201.    Plaintiff was correct that the Title IX office exceeded its jurisdiction. UVA had no jurisdictional authority to decide purported violations of UVA's Conflict of Interest Policy or the Provost Policy 033 when those policies were not implicated by underlying violations of UVA's Sexual Misconduct Policy.

202.    Under Section VII.C. of the Procedures, ("Mandatory Dismissal") for UVA's Title IX Policy, "[t]he University must dismiss a Formal Complaint (or any parts of the Formal Complaint) at the assessment stage or at any point prior to or during the investigation and hearing" for reasons that include, "if "[t]he alleged misconduct, even if proved, would not constitute Title IX Sexual Misconduct as defined in the Sexual Misconduct Policy." Here, the University should never have opened a Formal Complaint based on JH's allegations because they did not constitute Title IX Sexual Misconduct under its policy.

203.    Plaintiff explained that "[t]he [procedural] error began with the decision of the Title IX Coordinator, Meredith Smith, who stepped in to sign a formal complaint when the two 'complainants,' JH and TK, declined to do so. [That] Smith added these policy violations –over which her office had no jurisdiction—is also evidence of her bias against Plaintiff, aimed to find him responsible."

204.    With respect to the second ground (bias), Plaintiff argued that the Decision Maker chose to ignore the correct standard (requiring conduct that is directed at the complainant's sex that is objectively so "severe, pervasive, and offensive" that it effectively denies the complainant's access to the educational program), a standard that the Sexual Misconduct Policy incorporates from well-known legal standards. *See, e.g.,*

*Owens v. Louisiana State Univ., No.* CV 21-242-WBV-SDJ, 2023 WL 9051300, at \*5
(M.D. La. Dec. 31, 2023)

205.    Plaintiff argued that the Decision Maker's misapplication of the correct legal
standard reflected his discriminatory bias toward Plaintiff's sexual orientation. The
Decision Maker attributed *any* touching by Plaintiff of another male (i.e., TK), to be
necessarily "sexual" conduct because Plaintiff is an openly gay male, while TK is a
heterosexual male.

206.    Plaintiff noted that, even if the alleged touching at issue in TK's matter occurred,
there was no finding that it was sexual in nature. The evidence in the record suggested
that it was not, as it allegedly involved touching by Plaintiff of TK's non-intimate body
parts.

207.    Plaintiff also argued that the Title IX Coordinator's bias against him was reflected
by her failure to investigate and process TK and JH's matters separately. Plaintiff argued
that the Title IX Coordinator's partiality resulted in a biased analysis by the Decision
Maker, who evaluated the allegations of JH and TK together (referring to the "totality of
the evidence" and a purported "pattern" of conduct), despite that JH's allegations did not
even implicate *prohibited conduct* under the applicable policy, i.e., UVA's Sexual
Harassment Policy.

208.    Plaintiff also argued that the Decision Maker's sanctions were inappropriate
because the Decision Maker disregarded Plaintiff's rights as a tenured faculty member
under the For-Cause Discipline Policy.

209.   The Decision Maker had exceeded the powers of his authority by purporting to impose discipline under the Sexual Misconduct Policy, a policy that did not supersede Plaintiff's rights under the For Cause Discipline Policy.

### G. Final Outcome Letter.

210.   On or about December 1, 2023, Ian B. Baucom, UVA's Executive Vice President and Provost, issued Plaintiff an Appeal Determination and Final Outcome Letter, affirming the findings and conclusions of the Decision Maker.

## III.   VIOLATIONS OF TITLE IX AND UVA'S SEXUAL MISCONDUCT POLICY

### A. Plaintiff's Forced Resignation as Department Chair.

211.   Under the Sexual Misconduct Policy, "supportive measures" are non-disciplinary, non-punitive individualized services offered as appropriate," and "designed to address an individual's safety and well-being and to preserve or restore equal access to educational opportunities without unreasonably burdening the other party."

212.   Under the Sexual Misconduct Policy, removal from an administrative appointment, (such as Plaintiff's appointed position as Chair), constitutes "discipline," and is not an interim support measure. *See* Sexual Misconduct Policy, Grievance Process ("Appendix B") at D.4.p.ii.

213.   Title IX regulations require schools to treat the parties equitably, which for a respondent means refraining from imposing disciplinary sanctions or other actions that are not supportive measures (as defined in 34 C.F.R. § 106.30) against a respondent, without following the 34 C.F.R. § 106.45 grievance process. See, e.g., 34 C.F.R. §§ 106.44(a), 106.45(b)(1)(i).

214.    Under Title IX, as under UVA's Sexual Misconduct Policy, schools must follow the grievance process specified in 34 C.F.R. § 106.45 *before* taking an action that is not a supportive measure.

215.    Here, UVA violated Title IX and its own policy by forcing Plaintiff to step-down as Chair of the department of Architecture before giving him notice of the allegations, conducting an investigation, or finding him responsible for misconduct.

216.    UVA then replaced Plaintiff by appointing Professor Ripple as Chair of the Department, despite her being less qualified for the position.

**B.  Involuntary Leave.**

217.    Under the Sexual Misconduct Policy, the imposition of an interim suspension is considered a form of "emergency removal" and requires specified procedures, including notice to an employee and an opportunity to challenge the removal. Section III.A of the Sexual Misconduct Policy provides, in part:

 Pursuant to this policy, the University may impose an "Emergency Removal," such as an interim suspension or suspension from employment. Prior to the imposition of an Emergency Removal, the University will: (1*) undertake an individualized safety and risk analysis to determine whether an immediate threat to the physical health or safety of any student or other individual arising from the allegations of Prohibited Conduct justifies removal, and (2) provide the Respondent with notice and an opportunity to challenge the removal decision within 48 hours following the removal decision.*

218.    Here, UVA violated its policies as it was prohibited from requiring Plaintiff to choose under duress whether to "accept" the imposition of an "interim suspension" or to take a "voluntary" administrative leave, and informing Plaintiff that he had no choice.

**C.    Opening a Formal Complaint Based on Allegations that did not constitute Title IX sexual harassment or Title IX Prohibited Conduct.**

219.    Under Title IX, a "formal complaint means a document filed by a complainant or signed by the Title IX Coordinator alleging sexual harassment against a respondent," 34 C.F.R. § 106.30.

220.    UVA's Title IX Coordinator, Meredith Smith, has publicly stated that, when a "complainant" does not agree to signing a Formal Complaint, UVA only files a complaint on behalf of the complainant in "really extreme circumstances, like if we see a clear pattern of behavior with multiple reports or extreme uses of violence." https://hooscare.dev8.uvaits.virginia.edu/sites/hooscare/files/2022-09/Title%20IX%20Interview%20with%20Meredith%20Smith%20%281%29.pdf

221.    Under Title IX, "sexual harassment" is defined as *"conduct on the basis of sex"* that satisfies one or more of the following:

(1) Quid pro quo harassment ("An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct");

(2) Unwelcome conduct determined by a reasonable person to be so *severe, pervasive, and objectively offensive* that it effectively denies a person equal access to the recipient's education program or activity; or

(3) Certain sexually violent offenses ("sexual assault," "dating violence," "domestic violence," or "stalking"), as defined in under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f), and the Violence Against Women Reauthorization Act of 2013, 34 U.S.C. § 12291 *et seq*.

34. C.F.R. § 106.30(a) (emphasis added).

222.    Under Title IX, "[i]f the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, . . . then the recipient

*must dismiss* the formal complaint with regard to that conduct for purposes of sexual harassment under title IX." 34 C.F.R. § 106.45 (emphasis added).[7]

223.    As under Title IX, under the Sexual Misconduct Policy, a "formal complaint" must allege Title IX prohibited conduct or be subject to "mandatory dismissal" under UVA's Title IX process. The Sexual Misconduct Policy states, in pertinent part:

> The University shall dismiss a Formal Complaint, or any allegations therein, from the Grievance Process when the alleged conduct, even if proved would not constitute Title IX Prohibited Conduct as defined in the Sexual Misconduct Policy.

Appendix B at 19.

224.    Reflecting Smith's bias against Plaintiff's sex and/or sexual orientation, Smith deemed the allegations so "extreme" that she opened a "formal complaint" under UVA's Title IX process based on the combined allegations related to TK and JH, despite that none of the allegations met the criteria of Title IX "sexual harassment."

225.    While under Title IX and UVA's Sexual Misconduct Policy such a mandatory dismissal did not preclude UVA from taking action against Plaintiff for an alleged violation under another of UVA's policies, under the specific standards and procedures applicable to those policies, the two reports should never have been opened for purposes of a UVA Title IX proceeding. *See* 34 C.F.R. § 106.45.

226.    The Sexual Misconduct Policy authorizes the Title IX Office to administer two separate policies which are normally administered by UVA's Office for Equal Opportunity and Civil Rights ("EOCR"). These policies address other forms of

---

[7] While "such a dismissal does not preclude action under another provision of the recipient's code of conduct," the complaint is subject to mandatory dismissal for purposes of a Title IX proceeding. *Id*.

*discrimination* and *retaliation.*   More specifically, Section I of the Sexual Misconduct Policy provides:

The University's Office for Equal Opportunity and Civil Rights ("EOCR") administers separate policies **that address other forms of discrimination**, including discrimination on the basis of sex, and harassment, HRM-009: Preventing and Addressing Discrimination and Harassment and HRM-010: Preventing and Addressing Retaliation (collectively known as the "PADHR Policies"). These policies supersede any conflicting provisions contained in the EOCR Policies. ***Where Prohibited Conduct violates this policy and also violates the PADHR Policies, the University's response will be governed by the procedures referenced in this policy.***

(Emphasis added).

227.   Neither the Conflict of Interest Policy nor the Provost Policy address other forms of discrimination, and neither is one of the PADHR Policies referenced in the Sexual Misconduct Policy.

### D.   Consolidating two matters into a single complaint that arose from dissimilar facts and circumstances.

228.   Upon receipt of the NOIA, Plaintiff, through his advisor, immediately objected to this process and requested that the matters be bifurcated and investigated separately to avoid undue bias against him.

229.   Plaintiff correctly pointed out that he was the subject of two separate reports, from two different individuals (JH and TK), involving distinct factual allegations and circumstances.

230.   Under Title IX, consolidation of "formal complaints" is only permitted if they "arise out of the same facts or circumstances." 34 C.F.R. § 106.45.

231.    Through his advisor, Plaintiff objected to the consolidation of the two complaints and requested that the matters be investigated separately to avoid undue bias.

232.    Over Plaintiff's objection, Smith refused to investigate the matters separately, despite that the complaints, themselves, arose out of different facts and allegations, by two different individuals.

**E.    Failing to afford Plaintiff a neutral Investigator and Decision-Maker.**

233.    The Sexual Misconduct Policy entitles an accused to a neutral investigation and a presumption of non-responsibility:

> b) <u>Presumption of Non-Responsibility</u>. The investigation is a neutral fact-gathering process. The Respondent is presumed to be not responsible; this presumption may be overcome only where the Decision Maker concludes that there is sufficient evidence, by a Preponderance of the Evidence, to support a finding that the Respondent violated the Sexual Misconduct Policy.

Appendix B at VII.D.2.b.

234.    In rejecting Plaintiff's objections to the consolidation of the complaints, the Title IX Coordinator exhibited her bias against Plaintiff when she failed to investigate and process the formal complaints separately for each individual reporting party.

235.    Both Title IX and UVA's Sexual Misconduct Policy required UVA to afford Plaintiff a presumption that he was not responsible for the alleged conduct until a determination was made at the conclusion of the grievance process. *See* 2022 Title IX Policy at § III.I at 21; 34 C.F.R. § 106.45(b)(1)(iv).

236.    Here, the Investigator and the decision-maker in Plaintiff's grievance process considered *dissimilar allegations,* brought by two different individuals, TK and JH, in one proceeding, both with different implications under the applicable policies.

237.    Consolidation of these two matters by UVA substantially prejudiced Plaintiff's rights by resulting in a conflation of dissimilar facts and issues, which compromised Plaintiff's right to an impartial investigation and a neutral decision maker.

238.    Neither the Investigator nor the decision maker in Plaintiff's Title IX case were able to analyze the facts alleged in each matter (TK and JH's) impartially, as a result of the confusion of the different issues and facts presented by both matters in one proceeding.

239.    The Title IX coordinator's biased decisions in the processing and investigation of the allegations resulted in subsequent bias and lack of neutrality by the decision maker, who would later consider the so-called "totality of the evidence," and a purported "pattern" of so-called "multiple complainants" in adjudicating Plaintiff's case and recommending termination of his employment.

**F.    Unwarranted Delay in Investigating Grievance.**

240.    Under the Sexual Misconduct Policy, investigations are supposed to occur within a reasonably prompt time frame, with the goal being to complete the entire process within 75 to 90 days. According to the Policy, "[t]ypically, the period from commencement of an investigation through resolution (finding and sanction) will not exceed 90 business days. *See also* 34C.F.R. § 106.45(b)(1)(v).

241.    The length of the investigation in Plaintiff's case was excessive and unwarranted and was not justified by good cause.

242.    The delay in the investigation only exacerbated the damages to Plaintiff.

### G.  Retaliation For Participating in Process.

243.  UVA is prohibited from taking punitive action against any party participating in a Title IX investigative process prior to a finding of responsibility.

244.  Plaintiff filed complaints of retaliation, which he requested the Title IX office investigate, (see below list), but which UVA disregarded.

- On March 4, 2022: Plaintiff was warned to step-down as Chair or else things would "get worse."

- On March 28, 2022: Plaintiff was removed from campus.

- On March 30, 2022: Hutson sent a school-wide email announcing Plaintiff's step-down as Chair and his leave status.

- May 2, 2022: Anonymous users with IP addresses located in Charlottesville modified Plaintiff's Wikipedia entry, falsely stating that Plaintiff had been removed as a faculty member and linking to malicious comments that Plaintiff "was fired, lmao."

- August 19, 2022: On August 19, Hutson notified all faculty that they would receive this annual pay raise effective at the end of the month. Plaintiff was denied a merit salary increase to which he was entitled.

### H.  Breach of Plaintiff's Right to Privacy.

245.  Section III.3 of the Sexual Misconduct Policy provides: "***The University is committed to protecting the privacy of all individuals involved in the reporting, investigation, and resolution of a report under this policy***. The University also is committed to providing assistance to help Students, Employees, and Third Parties make informed choices. *With respect to any report under this policy, the University will make reasonable efforts to protect the privacy of participants*, in accordance with applicable state and federal law, while balancing the need to gather information to assess the report

and to take steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects."

246.    The Sexual Misconduct Policy goes on to state: "information related to a report of Prohibited ***Conduct will be shared with a limited circle of University Employees who "need to know" in order to assist in the assessment, investigation, and resolution of the report.***"

247.    UVA breached Plaintiff's right to privacy by the manner of Dean Hutson's email, which was sent to the entire School of Architecture and implied wrongdoing by Plaintiff prior to commencing an investigation or reaching any finding of misconduct.

## IV.  VIOLATION OF THE FOR-CAUSE DISCIPLINE POLICY: TERMINATING PLAINTIFF WITHOUT ADHERING TO THE PROCEDURAL PROTECTIONS AFFORDED TO UVA'S TENURED FACULTY.

248.    At all times relevant to this matter, the Office of the Executive Vice President and Provost maintained a published policy governing the Disciplinary Suspension or Termination of Academic Faculty ("For-Cause Discipline Policy").

249.    The For Cause Discipline Policy indicates that, "[t]ermination of a faculty member's employment before the end of a specified term or after a faculty member has been granted tenure is rare, but possible."

250.    Under the For Cause Discipline Policy, a tenured professor is entitled to specific procedures prior to the disciplinary suspension or termination. *See* For-Cause Discipline Policy at https://provost.virginia.edu/academic-policies/disciplinary-suspension-termination (last visited May 3, 2024). The For-Cause Policy states, in part, that:

A. The following administrative procedures govern "for-cause" disciplinary suspensions and terminations of academic faculty. These procedures do not apply to employees classified as administrative or professional non-tenure-track faculty, members of the professional research staff, or University staff, nor do they apply to decisions involving promotion, election to an indefinite term, reappointment, renewal, or non-renewal of appointments.

B. Academic faculty appointments are terminable for adequate cause. Adequate cause includes a clear level of professional incompetence, a serious breach of professional ethics or University policy, willful neglect of duty, or serious misconduct. These procedures provide that faculty members who face possible disciplinary suspension or termination shall receive:

  1. written notice of the charge(s) and summary of the information supporting them;

  2. an opportunity to meet with the responsible administrator to discuss the written notice of the charge(s);

  3. an opportunity to have an advisory faculty panel review the charge(s), including their factual justification; and

  4. written notice of the provost's decision.

C. Written Notice: Prior to initiating a termination or suspension, the dean (or provost) shall provide a faculty member with written notice of the charges and summary of the information supporting them. . . .

D. Meeting with the Dean: The dean (or provost) shall schedule a meeting with the faculty member to discuss the charges as soon as practicable, but normally within five calendar days after the date of the written notice of charges. . . .

E. After meeting with the faculty member, or after having provided the faculty member with an opportunity for such meeting, the dean shall formulate a recommendation to the provost. The dean may recommend termination, suspension . . . , a lesser sanction, or no sanction at all. As soon as practicable, the dean shall provide the faculty member with written notice of the recommendation. The provost may, however, initiate such action on his or her own authority, providing written notice to the faculty member.

F. Peer Review: After receiving written notice of a recommended termination or suspension, a faculty member will be entitled to peer review, as provided for below. The peer review will take place unless the faculty member requests, in a timely manner, to opt out of the peer review process. . . . . In the event the affected faculty member opts out of peer review, the provost or his designee shall nonetheless provide the faculty member with reasonable opportunity to discuss the charges and the dean's recommendation.

G. Administrative responsibility for deciding whether to suspend or terminate rests with the provost or other person authorized by the University's president, which decision may be further appealed as provided for in paragraph N. At any time, however, deans and other appropriate administrators are authorized to accept employment resignations without seeking further approval.

H.  Peer Review Process: The provost shall ask the chair of the Faculty Senate to appoint a faculty panel to assist in reviewing the charges. The panel shall be composed of three members selected from the ranks of the academic faculty. Every effort shall be made to avoid appointing any individual known to be directly involved in the underlying dispute. The chair of the Faculty Senate shall designate the chair of the panel.

I.  The panel shall review the charges, including the factual justification for disciplinary action; however, its proceedings hereunder are not designed to constitute a formal evidentiary hearing or trial. The panel shall provide the faculty member with an opportunity to meet with the panel and discuss the charges and offer his or her explanation as to why the recommended disciplinary action is unjustified. Such meeting shall be scheduled promptly and normally within ten (10) calendar days following appointment of the panel.

J.  The chair of the panel shall preside over all of its meetings and shall exercise his or her sound discretion to resolve any procedural issue that may arise, consistent with the following guidelines:

1.  The chair shall schedule panel meetings and shall promptly notify the affected faculty member, the provost, and the dean of that schedule.

2.  The faculty member may be accompanied by legal counsel; however counsel for either party may not participate in the panel session other than to advise his or her client.

3.  No one appearing before the panel shall be compelled to answer questions in violation of his or her constitutional privilege against self-incrimination.

4.  Formal rules of evidence, courtroom practices, and discovery rules do not apply to the panel's proceedings. However, with the assent of the panel chair, the panel may hear from and consider relevant testimony from persons who are present at the scheduled panel meeting when such consideration is requested by the faculty member or the administration. The burden is on the requesting party to arrange for such person being present for the scheduled panel meeting.

5.  The provost may be present to observe panel meetings with the faculty member. With the permission of the chair of the panel, the provost or designee may ask questions.

6.  The panel chair shall arrange for an audio recording to be made of the panel meeting with the faculty member or the dean (or provost).

7.  The burden shall be upon the administration to establish justification for termination or other serious disciplinary action.

K.  At the conclusion of its review, the panel shall prepare a written report and recommendation to the provost. In this report, the panel shall advise the provost whether, in its opinion, the charges appear reasonably justified and constitute grounds for

termination or other serious disciplinary action. Any dissenting reports shall be included in the panel report.

L.  The chair of the panel shall promptly deliver its report, recommendation, and original audio recording to the provost, with a copy of the report and recommendation provided to the faculty member, the dean, and the chair of the Faculty Senate. The panel's report and recommendation should be delivered to the provost within 10 calendar days following completion of its review and not later than 30 calendar days from the appointment of the panel. The provost may extend these deadlines for good reason.

M.  Provost's Decision: The provost shall review the advisory recommendation of the faculty panel, confer with the chair of the panel, make a decision, and communicate that decision in writing to the faculty member, the panel members, the chair of the Faculty Senate, and the dean.

N.  Grievance: The faculty member may appeal the provost's decision in accordance with and subject to the grievance procedures established by the Faculty Senate bylaws (http://www.virginia.edu/facultysenate). He or she may seek in this appeal appropriate relief, including reinstatement and/or reasonable back pay, excluding attorneys' fees or an award of damages. . . .

251. Plaintiff was immediately terminated and removed from the faculty at UVA on December 1, 2023, without the benefit of invoking "adequate cause" for termination and without utilizing the required procedures for terminating tenured professors under the For-Cause Policy, in violation of UVA's policies and Plaintiff's fundamental rights.

## V.   PLAINTIFF HAS SUFFERED IMMENSE DAMAGE.

252.    As a result of Defendants' actions in investigating and adjudicating the allegations against Plaintiff, he has suffered immense damage.

253.    Plaintiff has suffered professional and reputational harm and lost career opportunities. His removal as the Department Chair, followed by the unsanctioned email sent to the School of Architecture has destroyed his academic reputation and hindered his chances of securing any leadership role at any other institution in the future.

254.    Plaintiff has suffered physical pain and suffering, including a stress induced rash on his forehead and eyelid which traveled to his eye and permanently damaged his cornea.

255.    Plaintiff has also suffered emotional and psychological distress including anxiety.

**COUNT I**
**Violation of Title IX, 20 U.S.C. § 1681(a)**
**(As to UVA)**

256.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

257.    Title IX of the Education Amendments of 1972 ("Title IX") provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

258.    Title IX applies to all public and private educational institutions that receive federal funding, which includes a public university such as UVA.

259.    Title IX prohibits sex discrimination against employees of universities that receive federal funding—its protections are not limited to students. Employees, as well as students, have a private right of action under Title IX. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017); *Kadiki v. Virginia Commonwealth U.*, 892 F. Supp. 746, 749 (E.D. Va. 1995).

260.    As noted above at 221 *supra*, under Title IX, "sexual harassment" is defined as *"*conduct on the basis of sex" that satisfies one or more of the following:

a.  Quid pro quo harassment ("An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct");

b.  Unwelcome conduct determined by a reasonable person to be so *severe, pervasive, and objectively offensive* that it effectively denies a person equal access to the recipient's education program or activity; or

c.  Certain sexually violent offenses ("sexual assault," "dating violence," "domestic violence," or "stalking"), as defined in under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f), and the Violence Against Women Reauthorization Act of 2013, 34 U.S.C. § 12291 *et seq.*

34 C.F.R. § 106.30(a) (emphasis added).

261.    Under Title IX, "[i]f the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, . . . then the recipient *must dismiss* the formal complaint with regard to that conduct for purposes of sexual harassment under title IX." 34 C.F.R. § 106.45 (emphasis added).[8]

262.    As mandated in the 2001 Guidance, "OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees." *Id.* at 17. "A public school's employees have certain due process rights under the United States Constitution… The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding." *Id.* at 22. "Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment." *Id.*

---

[8] While "such a dismissal does not preclude action under another provision of the recipient's code of conduct," the complaint is subject to mandatory dismissal for purposes of a Title IX proceeding. *Id*.

263.   The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process." 2001 Guidance, at 20.

264.   Upon information and belief, UVA, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

265.   The Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) articulated two theories under which a plaintiff could plead a Title IX violation – erroneous outcome and selective enforcement.

266.   Under an "erroneous outcome" case, the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings. "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d at 715.

267.   Under the "selective enforcement" theory, the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

268.   While some circuits continue to analyze Title IX claims under the erroneous outcome and selective enforcement theories, the Fourth Circuit has adopted the Seventh Circuit's view that there is "no need to superimpose doctrinal tests on the [Title IX statute.] *Doe v. Purdue Univ*., 928 F.3d 652, 667 (7th Cir. 2019). More simply, "the standard for Title IX claims in this context" asks: "do 'the alleged facts, if true, raise a plausible inference that the university discriminated [against John Doe] 'on the basis of sex'?" *Purdue Univ*., 928 F.3d at 667–68.

269.   In so doing, the Fourth Circuit has noted however that it "find[s] no inherent problems with the erroneous outcome and selective enforcement theories identified in *Yusuf*.  In fact, either theory, with sufficient facts, may suffice to state a plausible claim. We merely emphasize that the text of Title IX prohibits all discrimination on the basis of sex. *See* 20 U.S.C. § 1681(a)." *Sheppard v. Visitors of Virginia State Univ.,* 993 F.3d 230, 236 (4th Cir. 2021).

270.   The Fourth Circuit has also recognized that Title IX's prohibition on sex discrimination encompasses discrimination based on sexual orientation.

271.   Citing *Bostock v. Clayton County, Georgia* (590 U.S. 644 (2020)), the Fourth Circuit in *Grimm v. Gloucester County School Board* observed that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. That is because the discriminator is necessarily referring to the individual's sex to determine incongruence between sex and gender, making sex a but-for cause for the discriminator's actions."

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020).

272.  UVA violated Title IX in the instant case because the University found Plaintiff responsible for sexual harassment, and bias based on his sexual orientation was a motivating factor in the wrongful findings.

273.  UVA applied its policies and procedures in a manner that discriminated against Plaintiff on the basis of his sexual orientation and led to erroneous outcomes.

274.  By way of example but not limitation:

   a.  UVA permitted a formal complaint against Plaintiff to move forward, notwithstanding that on their face, the allegations did not constitute violations of UVA's policy.
   b.  UVA subjected Plaintiff to a "Grievance Process" in which the Investigator and Decision-Maker relied on irrelevant "evidence" concerning Plaintiff's sex and sexual orientation, including Plaintiff's personal use of Grindr (a social networking app for the LGBTQ+ community).
   c.  Smith denied Plaintiff's request to investigate the two complaints separately, despite the undue bias that would (and did) result.
   d.  A primary focus of the Draft Report was Plaintiff's personal use of Grindr.
   e.  The report presented as fact, misstatements about Plaintiff and his job functions which were based on nothing more than the witnesses' personally held negative stereotypes and bias toward Plaintiff's sexual status as a gay male.
   f.  The Decision Maker attributed *any* touching by Plaintiff of another male (i.e., TK, a heterosexual male), to be necessarily "sexual" conduct because Plaintiff was an openly gay male, notwithstanding that, even if the alleged touching at issue in TK's matter occurred, there was no finding that it was sexual in nature. In fact, the evidence in the record suggested that it was not, as it allegedly involved touching by Plaintiff of TK's non-intimate body parts.
   g.  The Decision-Maker considered a purported "pattern" of so-called "multiple complainants" in adjudicating Plaintiff's case and finding him responsible, when no such pattern existed.

275.  UVA was motivated to find those accused of sexual misconduct responsible, and to impose severe sanctions, in light of prior criticism related to its handling of sexual

misconduct complaints and an investigation conducted by the Office for Civil Rights ("OCR").

276.    In July of 2015, UVA entered into a resolution agreement with the OCR, through which it affirmed "its continuing obligation, under Title IX, to take immediate and appropriate action to address sexual harassment and sexual violence, prevent its recurrence, eliminate any hostile environment and remedy its effects on any student…"

277.    As part of this resolution agreement, UVA "substantially revised its procedures for investigating and resolving reports of sexual harassment and violence…created and filled a dedicated Title IX Coordinator position; expanded investigative capacity in the Office of Equal Opportunity Programs…"

278.    In addition, on July 1, 2015, the University issued a new policy on sexual and gender-based harassment.

279.    In an effort to avoid further investigation by OCR, and under threat of rescission of federal funding for failure to comply with the mandates of the 2011 Dear Colleague Letter, UVA was motivated to find those accused of misconduct responsible.

280.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and unfair process in violation of Title IX, which led to an erroneous and unsupported finding of responsibility.

281.    This unlawful discrimination in violation of Title IX has proximately caused Plaintiff to sustain substantial and ongoing injury, damage, and loss, including, but not limited to:  emotional distress, psychological damages, loss of income and future career

opportunities, reputational damages, economic injuries, and other direct and consequential damages.

282.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

283.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

284.    Plaintiff is also entitled to an injunction directing UVA to: (i) vacate the findings made against him; (ii) remove all sanctions, conditions and restrictions placed on Plaintiff; and (iii) remove all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept.

**COUNT II**
**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***
**(Discrimination Based on Sex/Sexual Orientation)**
**(As to UVA)**

285.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

286.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits an employer from discriminating against an employee on the basis of their sex, which includes discrimination on the basis of sexual orientation.

287.    By the conduct alleged in detail above and herein, Defendants, through their agents and/or employees, discriminated against Plaintiff when it erroneously found him responsible for violations of its policies and terminated his employment without cause and without affording him the proper procedures.

288.    "[T]he elements of a *prima facie* case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Castonguay v. Long Term Care Mgmt. Servs., LLC,* No. 1:11CV682, 2014 WL 1757308, at *12 (M.D.N.C. Apr. 30, 2014), *citing Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir.2010).

289.    Plaintiff is a member of a protected class as he is a homosexual male. *See Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644, 645 (2020).

290.    Plaintiff satisfactorily performed his job while employed by UVA. From July 25, 2018 through Spring 2022, Plaintiff served as UVA's appointed Architecture Department Chair while also serving as a tenured member of the faculty, and satisfactorily performed all of his duties associated with the administrative and teaching responsibilities of both appointments.

291.    Plaintiff suffered an adverse employment action when UVA forced Plaintiff to step-down as Chair of the department of Architecture and subsequently terminated Plaintiff's tenured employment, in violation of the express terms of his employment contract.

292.    UVA replaced Plaintiff by appointing Professor Jeana Ripple as Chair of the Department, an individual who was, upon and information and belief, less qualified for the position than Plaintiff.

293.    Defendant's purported justification for the termination of Plaintiff's tenured employment was a pretext for unlawful discrimination, as evidenced by Defendant's unlawful actions and deviations from its own policies and procedures.

294.    As described in the foregoing paragraphs, Defendant, by its individual and or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's sex or gender, in violation of the Civil Right Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000 to 2000e-17.

295.    By comparison, a heterosexual male professor and department head at the University of Virginia who was accused by a female student of repeated sexual assaults that spanned more than a year was permitted to retain his faculty position during the course of the Title IX investigation. *See Doe v. Univ. of Virginia*, No. 3:23-CV-18, 2024 WL 1346913, at *3 (W.D. Va. Mar. 29, 2024)

296.    In contrast to Professor Correa's matter, even when the professor was ultimately found responsible after a university hearing and termination was recommended, the professor was permitted to resign. Notably, the underlying facts of this matter which remains in litigation occurred during the same timeframe as the investigation involving Professor Correa.

297.    Here, Professor Correa's heterosexual comparator was treated more favorably by Defendants.

298.   As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

**COUNT III**
**Breach of Contract**
**(As to UVA)**

299.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

300.   Plaintiff's May 15, 2018 appointment letter constituted a contract between Plaintiff and UVA and incorporated by reference the University's official policies, including the Sexual Misconduct Policy, the For Cause Discipline Policy, the Faculty Conflict of Interest Policy, and the Provost Policy.

301.   Following is a non-exhaustive list of the ways in which UVA violated Plaintiff's contractual rights by failing to adhere to its own procedures with respect to the complaints against Plaintiff:

- UVA subjected Plaintiff to invidious discrimination in his employment because of his sexual orientation;
- UVA instituted a "Formal Complaint" against Plaintiff based on allegations which, on their face, did not constitute violations of UVA's applicable Sexual Misconduct Policy;
- UVA failed to afford Plaintiff a fair and unbiased investigation;
- Subjected Plaintiff to a "Grievance Process" in which the Investigator and Decision-Maker relied on irrelevant "evidence" concerning Plaintiff's sex and sexual orientation, including Plaintiff's personal use of Grindr (a social networking app for the LGBTQ+ community);
- Failed to dismiss charges against Plaintiff which, *even if proved true*, would not constitute "sexual harassment" under the applicable Sexual Misconduct Policy;
- Failed to afford Plaintiff a presumption of innocence;

- Failed to make any attempt to obtain and consider potentially exculpatory evidence requested by Plaintiff;
- Failed to respond to retaliatory conduct against Plaintiff;
- Breached Plaintiff's right to privacy;
- Failed to conduct the investigation in the specified timeframe;
- Wrongfully forced Plaintiff to step down from his appointed position as Chair of his department;
- Required Plaintiff to choose under duress whether to "accept" the imposition of an "interim suspension" or to take a "voluntary" administrative leave, and informing Plaintiff that he had no choice;
- Ultimately terminated Plaintiff from his tenured position based on false allegations, and without invoking the for-cause provision and without adhering to the required procedural protections afforded tenured faculty under the express terms of Plaintiff's appointment.

302.    Based on the aforementioned facts and circumstances, Defendants breached express and implied agreements with Plaintiff.

303.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

**COUNT IV**
**Violation of the Equal Protection Clause, Pursuant to § 1983**
**(As to All Defendants)**

304.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

305.    The Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

306.     To plead an equal protection claim, a plaintiff must allege: (1) that he was treated differently from another similarly situated individual, and (2) that such selective treatment was based on impermissible considerations. *Baker v. McCall*, 842 F. Supp. 2d 938, 950 (W.D. Va. 2012).

307.     As discussed *supra,* Plaintiff was treated differently from a similarly situated individual, a heterosexual male professor and department head at the University of Virginia who was accused by a female student of repeated sexual assaults for over a year.

308.     While this professor was permitted to retain his faculty position during the course of the Title IX investigation, Professor Correa was forced to take an administrative leave.

309.     Additionally, though this male professor was ultimately found responsible after a university hearing and termination was recommended, the professor was permitted to resign, while Professor Correa was terminated from his tenured position.

310.     This disparate treatment of Professor Correa was based on impermissible considerations; specifically, his sexual orientation.

311.     Despite the far more egregious allegations brought against the other male professor, which spanned several years, Professor Correa was forced into an immediate leave and eventually terminated.

312.     Thus, Professor Correa's heterosexual comparator was treated more favorably by Defendants.

313.     This selective treatment was the result of bias against Professor Correa, based on his sexual orientation.

314.     Defendants subjected Plaintiff to discrimination on the basis of his sexual orientation when, among other things:

   a. UVA permitted a formal complaint against Plaintiff to move forward, notwithstanding that on their face, the allegations did not constitute violations of UVA's policy.
   b. UVA subjected Plaintiff to a "Grievance Process" in which the Investigator and Decision-Maker relied on irrelevant "evidence" concerning Plaintiff's sex and sexual orientation, including Plaintiff's personal use of Grindr (a social networking app for the LGBTQ+ community).
   c. Smith denied Plaintiff's request to investigate the two complaints separately, despite the undue bias that would (and did) result.
   d. A primary focus of the Draft Report was Plaintiff's personal use of Grindr.
   e. The report presented as fact, misstatements about Plaintiff and his job functions which were based on nothing more than the witnesses' personally held negative stereotypes and bias toward Plaintiff's sexual status as a gay male.
   f. The Decision Maker attributed *any* touching by Plaintiff of another male (i.e., TK, a heterosexual male), to be necessarily "sexual" conduct because Plaintiff was an openly gay male, notwithstanding that, even if the alleged touching at issue in TK's matter occurred, there was no finding that it was sexual in nature. In fact, the evidence in the record suggested that it was not, as it allegedly involved touching by Plaintiff of TK's non-intimate body parts.
   g. The Decision-Maker considered a purported "pattern" of so-called "multiple complainants" in adjudicating Plaintiff's case and finding him responsible, when no such pattern existed.

315.     Defendants are not entitled to qualified immunity because the right to be free from discrimination and adverse employment action based on sexual orientation was a clearly established constitutional right at the time of the violations.

316.     As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

317.    As a direct and proximate result of the above conduct, Plaintiff seeks injunctive relief requiring UVA to destroy all disciplinary records concerning Plaintiff.

## COUNT V
## Violation of the Virginia Human Rights Act
## (As to UVA)

318.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

319.    The Virginia Human Rights Act ("VHRA") provides that it is unlawful for an employer to "Fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's … sex, sexual orientation…" Va. Code Ann. § 2.2-3905 (West)

320.    For the same reasons articulated in Count II above, Defendants likewise violated the VHRA when they discriminated against Plaintiff on the basis of his sexual orientation.

321.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff Professor Correa prays for the following relief:

(i)  On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and requiring UVA to destroy all disciplinary records concerning Plaintiff;

(ii)  On the second cause of action for discrimination on the basis of sex in violation of Title VII, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring UVA to destroy all disciplinary records concerning Plaintiff;

(iii)  On the third cause of action for breach of contract, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future

economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) On the fourth cause of action for a violation of the Equal Protection Clause, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring UVA to destroy all disciplinary records concerning Plaintiff;

(v) On the fifth cause of action for a violation of the Virginia Human Rights Act, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses,

costs and disbursements, and an injunction or other equitable relief requiring UVA to destroy all disciplinary records concerning Plaintiff;

(vi) A declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (a) the outcome and findings made by UVA be reversed; (b) Plaintiff's reputation be restored; (c) Plaintiff's disciplinary record be expunged; (d) the record of Plaintiff's termination be removed from his file; (e) any record of the complaints against Plaintiff be permanently destroyed; and

(vii) Plaintiff be awarded such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:  New York, New York
   **August 19, 2024**

        **Respectfully submitted,**

        **NESENOFF & MILTENBERG, LLP**
        ***Attorneys for Plaintiff Felipe Correa***

        **By: _/s/ Andrew Miltenberg_**
        **Andrew T. Miltenberg, Esq.**
        (***pro hac vice* forthcoming**)
        **363 Seventh Avenue, Fifth Floor**
        **New York, New York 10001**
        **(212) 736-4500**
        **amiltenberg@nmllplaw.com**

        **By: _/s/ Tara J. Davis_**
        **Tara J. Davis, Esq. (*pro hac vice* forthcoming)**
        **Julie A. Sacks, Esq. (*pro hac vice* forthcoming)**

**101 Federal Street, Nineteenth Floor**
**Boston, Massachusetts 02110**
**(617) 209-2188**
**tdavis@nmllplaw.com**
**jsacks@nmllplaw.com**

**and**

**Farmer Legal PLLC**

**By:** ***/s/ Joshua Farmer***
**Joshua Farmer (VSB # 87508)**
**5030 Sadler Place, #205**
**Glen Allen, Virginia 23060**
**(804) 325-1441**
**josh@farmerlegalhelp.com**