CLERK'S OFFICE US DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

July 23, 2025

LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| FELIPE CORREA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:24cv65 |
| v. | ) | |
| | ) | |
| THE RECTOR AND VISITORS OF | ) | |
| THE UNIVERSITY OF VIRGINIA, | ) | |
| et al., | ) | By: Hon. Robert S. Ballou |
| | ) | United States District Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Felipe Correa, a former UVA professor, alleges that The Rector and Visitors of the University of Virginia discriminated against him in a Title IX proceeding in violation of Title IX, Title VII, and the Virginia Human Rights Act and in breach of his employment contract. Additionally, Correa asserts equal protection claims under 18 U.S.C. § 1983 against UVA and Defendants Malo A. Hutson, Dean of the School of Architecture, and Meredith Smith, UVA's former Title IX coordinator, in their official and personal capacities. Defendants moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim. Defendants' motion is **GRANTED** as to Correa's claim for gender discrimination under Title VII, his claim under the Virginia Human Rights Act, his personal capacity claims against Defendants Hutson and Smith, and his request for damages under 18 U.S.C. § 1983. The motion to dismiss is otherwise **DENIED**.

## BACKGROUND

Correa joined UVA in July 2018 as a tenured member of faculty and Chair of Architecture. Dkt. 1 ¶ 31. His executed Appointment Letter stated that Correa's "tenured

appointment as a Full Professor was 'without term[.]'" *Id.* ¶ 34. The letter instructed him to
"become familiar and comply with the University policies in effect from time to time…" and
included a link to "pertinent University policies." Dkt. 17-4. The pertinent University policies
included a "For Cause Discipline Policy," which "entitle[d] a tenured professor to the invocation
of adequate cause and specific, comprehensive procedures prior to the imposition of disciplinary
suspension or termination." Dkt. 1 ¶¶ 40. The University policies also included UVA's Sexual
Misconduct Policy, which described the conduct prohibited by Title IX and details the grievance
process by which UVA addresses such conduct. *Id.* ¶ 41.

Correa alleges that from fall 2020 to spring 2022 he used Grindr, "a [dating] app for gay,
bi, trans, and queer people." *Id.* ¶ 53. He alleges "upon information and belief" that Hutson heard
rumors about Correa's use of the app and, in January 2022, reported his concerns to then UVA
Provost Liz Magill, who indicated they should "monitor the situation." *Id.* ¶¶ 54–55. Correa
further alleges upon information and belief that, around the same time, JH, a graduate student in
the Architecture Department, told another student that Correa would be leaving the institution.
*Id.* ¶ 56.

On March 2, 2022, Hutson asked Correa to step down from his position as Chair of
Architecture in exchange for "three years of summer salary, additional research funds, the ability
to teach a class of his choosing upon his return, and a full year of sabbatical." Correa alleges he
had no "prior warning" and was in "complete shock and confusion." *Id.* ¶¶ 57–58. Two days
later, on March 4, 2022, Correa asked Hutson for an increase in the offered base salary. In
response, Hutson "began shouting at [Correa] and told him that if he did not sign the agreement
to step down, 'it would get much worse' for him." *Id.* ¶ 59. Correa ultimately signed the
agreement on March 5, 2022. *Id.* ¶ 60.

On March 23, 2022, Hutson filed two "reports" against Correa with UVA's Title IX office containing allegations of sexual misconduct. *Id.* ¶ 61. Correa met six days later, on March 29, 2023, with Hutson, Smith and other UVA officials and was placed on administrative leave and prohibited from being on the grounds or communicating with the UVA community. *Id.* ¶¶ 62–64. Correa alleges that forced "administrative leave" "substantially diminished his capacity to conduct research . . . [and] resulted in the indefinite postponement of a forthcoming publication . . . a book project . . ., and a planned retrospective . . . of his work[.]" *Id.* ¶ 65.

On March 30, 2022, Hutson emailed the entire School of Architecture that Correa "had been placed on administrative leave, removed as Department Chair, banned from campus, and prohibited from participation in UVA online courses and virtual events." *Id.* ¶ 66. Hutson's email read, "we are working together to support our community and, most importantly, to ensure the wellbeing of our students." *Id.* ¶ 67. Correa alleges the email implied that he was a threat to students' safety causing irreparable harm to his reputation. *Id.* ¶¶ 68–71.

On or around April 4, 2022, Correa received a Notice of Allegations and Investigation from the Office of Equity and Inclusion stating that he had been named in a Title IX complaint based on reports made by two male graduate students, TK and JH.[1] *Id.* ¶¶ 72–73. The complaint alleged that Correa sexually assaulted TK and sexually harassed JH. *Id.* ¶4. Correa alleges that the accusations were "suspiciously like" those made in an anonymous crowdsourced spreadsheet call "Shitty Architecture Men" that circulated online in spring 2018.[2] *Id.* ¶¶ 46, 75.

Specifically, JH alleged that, in August 2020, before enrolling as a graduate student in the School Architecture, he sent Correa nude photos on Grindr. *Id.* ¶ 90. Correa did not reciprocate.

---

[1] The students reported their claims to Hutson but declined to file a formal complaint. Hutson subsequently submitted the reports to UVA's Title IX office.
[2] Correa alleges that UVA was aware of the spreadsheet when he was hired in July 2018.

*Id.* JH further alleged that, after enrolling, he had consensual sexual encounters with Correa in February and March 2021. *Id.* TK alleged that between summer 2021 and November 2022, Correa touched his shoulder, back and abdomen, which TK viewed as inappropriate. *Id.* ¶ 92.

The Notice of Allegations and Investigation against Correa also stated that the Title IX office had appointed an outside investigator, Amanda Ames, to handle the complaint. *Id.* ¶ 88. It further noted that Correa's alleged conduct implicated the following policies: (1) Quid Pro Quo Harassment (Title IX Prohibited Conduct); (2) Sexual Harassment (Title IX Prohibited Conduct); (3) Sexual and/or Gender-Based Hostile Environment Harassment; (4) Faculty Conflict of Interest Policy; and (5) Provost Policy. *Id.* ¶ 83.

The quid pro quo harassment, sexual harassment and Sexual and /or Gender-Based Hostile Environment Harassment policies regulate "unwelcome" prohibited conduct. *Id.* ¶¶ 42, 45. The Faculty Conflict of Interest Policy and Provost Policy cover consensual relationships. *Id.* ¶ 84. Correa alleges that UVA's Sexual Misconduct Policy charged the Title IX office with responding to Title IX Prohibited Conduct and Sexual and/or Gender-Based Hostile Environment Conduct and not "violations of either the Faculty Conflict of Interest Policy or the Provost Policy." Id. ¶¶ 85–87. He argues that on their face neither TK nor JH's complaints fall under the Title IX Prohibited Conduct or Sexual and/or Gender-Based Hostile Environment Conduct, because JH's relationship with Correa was consensual and TK did not allege conduct that was severe or pervasive enough to constitute sexual harassment. *Id.* ¶¶ 91, 93.

On April 15, 2022, Correa wrote to Smith to request that TK and JH's complaints be handled separately. *Id.* ¶ 94. He argued that joining the complaints would bias the investigations, because "the existence and or facts of each of the cases will affect the other…." *Id.* ¶ 95. Charlotte Breen, Deputy Title IX Coordinator, denied his request, explaining that "a single

investigation [was] appropriate" because "the facts alleged are substantially related to each other, in both timing and content." *Id.* ¶¶ 96–97. Correa renewed his request on April 27, 2022, which was again denied. *Id.* ¶¶ 101–103.

UVA released a draft investigation report on December 9, 2022 which noted that JH, TK and their peers, as well as Dean Hutson were suspicious of Correa's personal use of Grindr. *Id.* ¶¶ 106, 108–09. The report confirmed that Correa and JH had a brief exchange on the app before JH enrolled as a graduate student and that the exchange "did not lead to or involve a sexual encounter between Correa and JH." *Id.* ¶¶ 113, 125. It also included a photograph of Correa's personal profile on Grindr, which Correa alleges was irrelevant to the Title IX investigation "as it neither demonstrated that Plaintiff had communicated with JH on Grindr or that Plaintiff had ever had a sexual relationship with JH." *Id.* ¶ 116–18. Rather, Correa argues, the photo was only included to "demonstrate that Plaintiff was an openly gay male, and to subject Plaintiff to discriminatory animus based on negative stereotypes." *Id.* ¶ 119.

Correa argues that the December 9, 2022, draft report contained "other indicia of bias," including stereotypes about gay men, mischaracterizations of Correa's job responsibilities, and a failure to interview witnesses that might have supported Correa. *Id.* ¶¶ 126–29. Correa also alleges that the report contained unsubstantiated and prejudicial statements from a female graduate student who "warned" TK that he should "be wary of working for [Correa]" and asserted that Correa "like[d] to have a chosen one." *Id.* ¶¶ 131–32. Correa raised these concerns in his response to the report and asked that the investigator be replaced. His request was denied. *Id.* ¶¶ 137–38. Correa also submitted several complaints of retaliation against UVA, JK, TK and Hutson. UVA did not investigate these claims. *Id.* ¶ 139–40.

On or around March 23, 2023, prior to any formal finding by the Title IX office, UVA moved Correa's "belongings out of the office reserved for the Chair of the Department and reallocated his office space without notifying him." *Id.* ¶¶ 142–44. UVA ultimately elevated Professor Jeana Ripple to Department Chair and moved her into Correa's former office. *Id.* ¶ 143. Correa asserts, upon information and belief, that Ripple is less qualified for the Chair position. *Id.* at 292.

On or around June 9, 2023, the investigator issued the final investigation report to Christopher Tate, an outside attorney and the appointed "Decision-Maker" in the Greivance Process, for his consideration. *Id.* ¶¶ 145–47, 167. The report included the purportedly prejudicial evidence included in the draft report. *Id.* ¶¶ 145–47. It concluded the following:

- [T]here was *insufficient* evidence to support findings of responsibility for:
    - Quid Pro Quo Harassment (Title IX Prohibited Conduct)
    - Sexual Harassment (Title IX Prohibited Conduct)
- [T]here was *sufficient* evidence to support findings of responsibility for:
    - Sexual and/or Gender-Based Hostile Environment Harassment – *as to TK only*
    - Faculty Conflict of Interest Policy – *as to both TK and JH*
    - Provost Policy 033: Restrictions on Certain Romantic or Sexual Relationships at the University – *as to JH only*

On September 19, 2023, Tate made the following findings:

- There was ***insufficient*** evidence to find Plaintiff responsible for:
    - Quid Pro Quo Harassment – *JH and TK*
    - Sexual Harassment (Title IX Prohibited Conduct) – *JH only*
    - Sexual and Gender Based Hostile Environment Harassment – *JH and TK*
    - Provost Policy 033 – *TK only*
- There was ***sufficient*** evidence to find Plaintiff responsible for:
    - Sexual Harassment (Title IX Prohibited Conduct) – *as to TK*
    - Faculty Conflict of Interest Policy – *JH and TK*
    - Provost Policy 033 – *as to JH*

*Id.* ¶ 168 (emphasis in original). Correa alleges that Tate inappropriately disregarded the legal standard for Title IX Sexual Harassment by accepting TK's subjective perception that Correa's

alleged touching of TK's non-intimate body parts was "unmistakably sexual in nature" despite the fact there were no eyewitnesses who corroborated his allegations. *Id.* ¶ 171. Correa also alleges that Tate improperly characterized Correa's responses to the investigation as "bare denials" and presumed that TK was one of "multiple" complainants. *Id.* ¶ 179–80.

Tate recommended termination of employment, with no eligibility for rehiring. Correa appealed on three grounds: (1) procedural irregularity affecting the outcome; (2) bias of the Title IX Coordinator, investigator, or respondent; and (3) inappropriate disciplinary action. *Id.* ¶ 199. Specifically, he argued that the university should have dismissed the complaint based on JH's allegations because they did not constitute Title IX Sexual Misconduct as they involved consensual sexual conduct. *Id.* ¶¶ 202, 192. He also argued that Tate applied the wrong legal standard to sexual harassment and accepted that Correa's alleged contact with TK was sexual in nature because Correa is gay. *Id.* ¶ 205. Additionally, he asserted that he was biased by the decision to investigate TK and JH's matter together even though the facts were distinct, and JH's allegations did not implicate Title IX Prohibited Conduct. *Id.* ¶ 207. Finally, Correa argued that the sanctions were inappropriate because they "disregarded [Correa's] rights as a tenured faculty member under the For-Cause Discipline Policy." *Id.* ¶ 208. Ian Baucom, UVA's Executive Vice President and Provost, affirmed Tate's findings and conclusions on December 1, 2023. *Id.* ¶ 210.

Correa brought this action against UVA and the individual defendants asserting five causes of action.

> Count I – Violations of Title IX. Correa alleges that UVA violated Title IX by: 1) disciplining him without completing the grievance process i.e. removing him as Chair of Architecture, forcing him on to administrative leave, etc…; 2) opening a formal complaint based on allegations that did not constitute Title IX sexual harassment or Title IX prohibited conduct; 3) consolidating two matters into a single complaint that arose from dissimilar facts and circumstances; and 4) retaliating against him for participating in the process.

Count II – Violation of Title VII. Correa alleges that UVA discriminated against him based on his gender in violation of Title VII by replacing him as Chair of Architecture with a less qualified woman. He also asserts that UVA discriminated against him based on his sexual orientation in violation of Title VII because the University treated him differently than a heterosexual male during its Title IX investigation.

Count III – Breach of Contract. Correa alleges that UVA breached his employment contract by violating the University's Sexual Misconduct Policy, the For Cause Discipline Policy, the Faculty Conflict of Interest Policy, and the Provost Policy.

Count IV – Violation of Equal Protection Clause (42 U.S.C. § 1983). Correa asserts that all Defendants violated his right to equal protection under the Fourteenth Amendment because UVA treated other professors subject to Title IX investigations differently.

Count V – Violation of the Virginia Human Rights Act. Correa alleges that UVA discriminated against him based on his gender and sexuality in violation of Title VII.

Correa seeks "damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, loss of future career prospects and fees. He also seeks an injunction or other equitable relief requiring UVA to destroy all disciplinary records. Finally, he seeks a declaratory judgment finding that: (a) the outcome and findings made by UVA be reversed; (b) his reputation be restored; (c) his disciplinary record be expunged; (d) the record of his termination be removed from his file; (e) any records of the complaints against him be permanently destroyed.

UVA and the individual Defendants have filed a motion to dismiss. Specifically, Defendants seek to dismiss Count IV and V under Rule 12(b)(1) for lack of subject matter jurisdiction and Counts I – IV under Rule 12(b)(6) for failure to state a claim.

## STANDARDS OF REVIEW

**A.  12(b)(1)**

8

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss an action for lack of subject-matter jurisdiction. In reviewing a Rule 12(b)(1) motion, a court determines whether "plaintiff's allegations standing alone and taken as true plead jurisdiction and a meritorious cause of action." *Allianz Insurance Co. of Canada v. Cho Yang Shipping Co., Ltd.*, 131 F.Supp.2d 787, 789 (E.D. Va. 2000) (quoting *Dickey v. Greene*, 729 F.2d 957, 958 (4th Cir. 1984)). The party seeking to invoke the court's authority bears the burden of establishing subject-matter jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

"When a defendant files a Rule 12(b)(1) motion challenging subject-matter jurisdiction and relying simply on the allegations of the complaint, the court must take the jurisdictional facts alleged as true—as in the case of a motion filed under Rule 12(b)(6)—and determine, as a matter of law, whether the court has jurisdiction." *Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 292 (4th Cir. 2022). "But if the defendant disputes the facts alleged for jurisdiction, providing the court with contradicting facts, the court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Id.* (internal quotation marks omitted). "A Rule 12(b)(1) motion to dismiss should be granted 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *Zeigler v. Eastman Chemical Co.*, 54 F.4th 187, 194 (4th Cir. 2022) (quoting *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999)).

### B.  12(b)(6)

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Legal conclusions, however, are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 679 (2009).

## ANALYSIS

### A. Virginia Human Rights Act (Count V)

UVA moves to dismiss Count V, the Virginia Human Rights Act claims, pursuant to Rule 12(b)(1). It argues that UVA is not subject to the Act because the "General Assembly did not waive sovereign immunity under the VHRA." Dkt. 17 at 20. UVA is correct. *See Fogleman v. Commonwealth*, 2023 WL 6065593, *4 (Va. Ct. App. Sept. 19, 2023) (dismissing a case against VCU because "the General Assembly did not expressly or by necessary implication waive sovereign immunity under the VHRA"). Accordingly, I dismiss Count V for lack of jurisdiction.

### B. Equal Protection Claims (Count IV)

Defendants move to dismiss Count IV – the equal protection claims - under Rule 12(b)(1) and Rule 12(b)(6). They argue 1) the claims are barred by sovereign immunity and 2) Correa has failed to plead facts sufficient to allow the Court to infer that he was discriminated against based on his gender and sexual orientation. Additionally, Defendants Hutson and Smith argue that they are entitled to qualified immunity and therefore the claims asserted against them in their personal capacity should be dismissed. To the extent Correa's claim of discrimination is based on his sexual orientation, his equal protection claim against UVA and official capacity claims against

10

Hutson and Smith may proceed. However, the personal capacity claims against Hutson and Smith are dismissed, because Defendants have qualified immunity.

### 1. Sovereign Immunity

Defendants move to dismiss the equal protection claims against UVA and the official capacity claims against Hutson and Smith for lack of jurisdiction because the Defendants are entitled to sovereign immunity. Dkt. 17 at 16–18. Correa concedes that he cannot recover money damages from official capacity defendants but argues that the equal protection claim against UVA survives because he seeks prospective injunctive relief in the form of "vacating … disciplinary records." Dkt. 22 at 18. UVA responds that vacating disciplinary records is retrospective relief and is therefore barred by the Eleventh Amendment.

The *Ex parte Young* Doctrine authorizes "suits against state officers for prospective equitable relief from ongoing violations of federal law." *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001). "To determine whether the *Ex parte Young* doctrine is applicable, . . . a court 'need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Shepard*, 77 F. App'x at 620 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635 (2002)).

In *Shepard v. Irving*, the Fourth Circuit considered whether the plaintiff's request for expungement of an "F" she received in class and of a plagiarism conviction constituted prospective relief. *Id.* at 620. The Court held that both the "F" and the plagiarism conviction represented a "continuing injury to the plaintiff. Thus, the plaintiff's two requests for expungement would relate to an ongoing violation of federal law and the relief granted would be prospective in nature." *Id.* Likewise, here, Correa has requested, among other things, that his "disciplinary record be expunged" and "the record of Plaintiff's termination be removed from his

11

file." The existence of these files, like the *Shepard* plaintiff's "F" and plagiarism conviction, represent a continuing injury. Accordingly, Correa's request to expunge his disciplinary records is prospective injunctive relief. *See Doe v. Virginia Polytechnic Institute and State University*, 2020 WL 1309461, *4 (W.D. Va. Mar. 19, 2020) (finding plaintiff's request to "expunge and clear his academic record" was a request for prospective relief).

I conclude that UVA and official capacity Defendants do not have Eleventh Amendment immunity from Correa's equal protection claims which seek prospective relief in the form of expungement of his administrative records. Thus, Defendants' motion to dismiss Count V on jurisdictional grounds is denied.

### 2. Failure to Plead Similarly Situated Comparators

Defendants next seek dismissal under Rule 12(b)(6) of Correa's equal protection claims in Count IV on the ground that he failed to allege comparators sufficiently similarly situated for the court to infer that he was discriminated against based on his gender and sexual orientation.

"Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (addressing discrimination claims in the context of Title VII) [3] (citation omitted). However, where a plaintiff's theory of discrimination is by comparison to employees from a non-protected class, the plaintiff "must demonstrate that the comparator was 'similarly situated' in all relevant

---

[3] While the Fourth Circuit has held that equal protection claims of racial discrimination in employment are evaluated under the Title VII framework, it has never addressed whether gender or sexual orientation-based claim should be similarly evaluated. *See Patterson v. Virginia Dep't of Corrections*, 2024 WL 1704669, at*15 (E.D. Va. April 19, 2024). However, as both Parties rely on Title VII, I find that it is appropriate to apply the Title VII framework for the purposes of this motion.

respects." *Johnson v. Balt. City Police Dep't.*, 2014 WL 1281602, at *19 (D. Md. Mar. 27, 2014)

(quoting *Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*,

576 F. App'x 199 (4th Cir. 2014)). To survive a motion to dismiss, Plaintiff need only plead

"'facts which give rise to the inference' that she and her comparators 'are similarly situated in all

relevant respects.'" *Robertson v. Virginia State Univ.*, 2024 WL 1774821, at *14 (E.D. Va. Apr.

24, 2024) (quoting *Altuzarra v. Loudoun Cnty. Sch. Bd.*, 2020 WL 13690343, at *4 (E.D. Va.

May 5, 2020)). "[E]videntiary determinations regarding whether the comparators' features are

sufficiently similar to constitute appropriate comparisons generally should not be made" at the

pleading stage. *Woods v. City of Greensboro*, 855 F.3d 639, 650 (4th Cir. 2017).

Here, Correa has identified two comparators—Ripple, who replaced him as Chair of

Architecture, and Roe, another faculty member who was disciplined following a Title IX

investigation. As to Ripple, Correa has failed to allege a comparator sufficient to support a

plausible claim of gender discrimination. The only allegations regarding Ripple are that she is a

woman and that she is "upon information and belief, less qualified for the position than

Plaintiff." Dk. 1 ¶ 292. The mere fact that Correa was replaced by a woman does not suggest

discrimination. Without some factual allegations supporting the assertion that Ripple was less

qualified than Correa, it is not plausible that Ripple's promotion (and Correa's demotion) was

caused by invidious discrimination rather than the "obvious alternative explanation that the

decision makers simply judged [her] to be more qualified and better suited for the position[.]"

*Woods*, 855 F.3d at 648.

As to Roe, Correa has alleged a comparator sufficient to support a plausible claim of

discrimination based on sexual orientation. Correa alleges that Roe is "a heterosexual male

professor and was a department head at the University of Virginia who was accused by a female

student of repeated sexual assaults that spanned more than a year[.]" Dkt. 1 ¶ 295. Unlike Correa,

Roe was "permitted to retain his faculty position during the course of the Title IX investigation"

and was eventually permitted to resign from his position. *Id.* ¶¶ 295–96. These facts establish

that Roe and Correa held similar positions and faced similar accusations. At this stage, these

similarities are sufficient to raise the inference that Correa received different treatment during the

Title IX investigation than Roe because he is gay.

UVA argues that Roe is not similarly situated because the allegations against him were

investigated during COVID under a prior version of UVA's Title IX policy. Dkt. 17 at 13–14.

Thus, unlike Correa, it was not necessary to put Roe on leave to avoid contact with the Title IX

complainant. *Id.* Moreover, UVA argues that Roe was not permitted to resign. *Id.* at 14. Rather,

he resigned before the Provost could terminate his employment. *Id.* UVA's argument is not

persuasive in the context of a motion to dismiss. UVA may be correct that Roe was treated

differently than Correa for non-discriminatory reasons. However, this evidentiary inquiry is not

appropriate at the motion-to-dismiss stage. As the Middle District of North Carolina explained:

> while it is permissible to consider the existence of comparators themselves (i.e.,
> whether a comparator is actually a nonminority and occupies the same position
> vis-à-vis the defendant as plaintiff), it is not permissible to consider comparator-
> specific facts other than racial identity or position, even if such facts are alleged in
> the complaint or responsive pleadings.

*Tabb v. Bd. of Educ. of Durham Pub. Sch.*, 2019 WL 688655, at *8 (M.D.N.C. Feb. 19, 2019),

aff'd, 29 F.4th 148 (4th Cir. 2022).[4] As to Count II, to the extent Correa's Title VII is based on

---

[4] At the motion to dismiss hearing, UVA asked the Court to take judicial notice of the facts
surrounding Roe's treatment during his Title IX proceeding from this Court's summary judgment
opinion in *Jane Doe v. Rectors and Visitors of the Univ. of Va., et al.*, Dkt. 115, 3:23-cv-00018
(Nov.14, 2024), but the Court did not make any findings as to whether Roe was permitted to
resign or about the substantive differences between the Title IX policy that applied to Roe's
conduct and the policy that applied to Correa. Thus, I find that additional factual development is
required to determine whether Roe is similarly situated to Correa.

his gender, UVA's motion is granted. However, to the extent, Correa's equal protection claim is based on his sexual orientation, UVA's motion is denied.

### 3. Qualified Immunity

Defendants Hutson and Smith argue that the equal protection claims asserted against them in their individual capacities should be dismissed because they are entitled to qualified immunity because it was not clearly established that placing Correa on leave pending the outcome of the Title IX investigation violates Correa's right to equal protection. Dkt. 17 at 19–20. I agree and dismiss Correa's claims against Hutson and Smith in their individual capacities.

"Officials lose the protection of [qualified] immunity only if it appears that (1) they violated a statutory or constitutional right of the plaintiff and (2) the right was 'clearly established' at the time of the acts complained of such that an objectively reasonable official in their position would have known of the right." *McVey v. Stacy*, 157 F.3d 271, 276 (4th Cir. 1998). The Supreme Court has emphasized that the right must be clearly established in a particularized relevant sense:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In the context of an equal protection claim, the question is whether "an [official] could reasonably have thought, in light of clearly establish law, that [his] conduct was consistent with [the plaintiff's] rights to be free from discrimination." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).

Here, Correa cites several cases establishing that the Equal Protection Clause prohibits discrimination based on sex. Dkt. 22 at 21 (citing *Reed v. Reed*, 404 U.S. 71 (1971)). However,

the fact that individuals have a right to be free from sex discrimination at a "general or abstract level" is not sufficient to establish that Defendants' conduct violated a "clearly established right." *See Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995). Rather, the court must consider the right in the context of the "specific conduct being challenged." *Id.* Plaintiff does not cite a single case involving facts or circumstances like those presented in his Complaint. Moreover, given the context—two separate sets of sexual harassment allegations, two separate Title IX investigations— it is far from clearly established that placing one professor on leave during the pendency of an investigation and not the other violated the Equal Protection Clause.

Accordingly, I find that Hutson and Smith are entitled to qualified immunity and dismiss the personal capacity claims against them.

## C. Title IX Claims (Count I)

UVA moves to dismiss Correa's Title IX claims because "[Title IX] does not provide any explicit private right of action for employees of educational institutions against their employers." Dkt. 17 at 8 (quoting *Capone v. Univ. of Ark.*, 2016 WL 3466385, 3 (W.D. Ark. June 20, 2016). UVA argues that "Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." *Id.* at 10 (citing *Lakoski v. James,* 66 F.3d 751, 753 (5th Cir. 1995)). However, as UVA acknowledges, its argument contravenes *Preston v. Virginia*, in which the Fourth Circuit held, "[a]n implied private right of action exists under Title IX, which extends to employment discrimination on the basis of gender by educational institutions receiving federal funds." 941 F.2d 1207 (Table), *2 (4th Cir. 1991). While the *Preston* Court did not expressly address whether Title IX claims can proceed alongside Title VII claims, numerous other courts in the Fourth Circuit have permitted such claims to proceed simultaneously. *E.g.*, *Jones-Davidson v. Prince George's Cmty. Coll.*, 2013

16

WL 5964463, *3 (D. Md. Nov. 7, 2013) ("[A]uthority within this circuit suggest[s] that Title VII

and Title IX claims can proceed simultaneously."); *Bartges v. Univ. of N.C. at Charlotte*, 908 F.

Supp. 1312, 1332 (W.D. N.C. 1995). I find persuasive the balance of authority after *Preston*

which allow both Title VII and Title IX claims of discrimination on the basis of gender to

proceed, and **DENY** UVA's motion to dismiss Correa's Title IX claims in Count I.

### D.  Title VII Claims (Count II)

UVA next argues that Correa's Title VII claim should be dismissed because he has not

sufficiently alleged that the two individuals whose treatment purportedly demonstrate that UVA

discriminated against him based on his gender and sexual orientation are "similarly situated."

For the same reasons I found that Correa's allegations about Roe were sufficient to support an

equal protection claim, I find that Correa has adequately pled a Title VII claim based on his

sexual orientation discrimination. *See supra* at pp. 12–13. Likewise, for the same reasons I found

that Correa's allegations about Ripple did not support an equal protection gender discrimination

claim, I find that Correa failed to plead a Title VII claim based on his gender.

### E.  Breach of Contract (Count III)

Correa contends that UVA breached his employment contract when it violated the

University's Sexual Misconduct, For Cause Discipline, Faculty Conflict of Interest and Provost

policies. UVA moves to dismiss Correa's breach of contract claim because these policies were

incorporated into Correa's employment contract. I find that UVA is bound by its policies, and

therefore, Correa has sufficiently pled a breach of contract.

Correa's appointment letter provides in relevant part:

You are expected to become familiar and comply with the University policies in
effect from time to time, including the University's Code of Ethics and its Conflict
of Interest Policies, and also provide appropriate leadership and supervision of
those reporting to you. You may access pertinent University policies through the

University's Policy Directory at http://www.viginia.edu/uvapolicies/, and other faculty policies on the Provost's website at:
http://www.virginia.edu/provost/policies.html. In accepting this offer of employment, you agree to abide by the University Code of Ethics, available at http://www.virginla.edu/statementofpurpose/uethics.html. Because you will be acting in a supervisory position and will be involved in our hiring process, you will be held accountable for Equal Opportunity/Affirmative Action policies and compliance in your area of responsibility. These policies may be found on the Equal Opportunity Office homepage at http://www.virginia.edu/eop. It is your responsibility to be aware of these policies and procedures as well as others that may apply to you. You should further be aware that these policies may be changed from time to time by the governing board or administration.

Dkt. 17-4. UVA argues that the letter does not incorporate the employment policies. Rather, it merely instructs Correa "to become familiar" with the policies. Moreover, UVA suggests that even if the policies were part of Correa's contract, they do not create any contractual rights because it expressly states that the policies may be unilaterally changed by the school. Dkt. 17 at 16. In support of its argument, UVA cites to several cases finding that employers were not bound by policies in their employee handbooks because they expressly disclaimed any intent to create a contractual obligation (*e.g.*, *Atta v. Nelson*, 2012 WL 178355, at *3 (W.D. Va. Jan. 23, 2012)). *Id.* UVA also relies on Judge Moon's decision in *Jackson v. Liberty Univ.*, 2017 WL 3326972, *5 (W.D. Va. Aug. 3, 2007) in which he held that Liberty University's Student Code of Conduct did not bind the university because it could be changed unilaterally by the school and therefore lacked mutuality.

I disagree with UVA's contention that the contract did not incorporate the policies. In addition to instructing Correa "to become familiar" with the policies it requires him to "comply" with the policies. As such, it places an obligation on Correa which, in my view, this is sufficient for incorporation of the policies into the employment contract.

Similarly, I disagree with UVA's position that the fact that it can unilaterally change its policies necessarily destroys mutuality. In *Thompson v. Am. Motor Inns Inc.*, 623 F. Supp. 409, 416 (W.D. Va. 1985), the court found that a company created an implied "promise[] to abide by its own policy for disciplining and discharging employees who commit infractions of [Defendant] AMI's conduct policy. The court explained:

> AMI has listed specific types of misconduct that are grounds for issuing warnings and types of misconduct which give AMI just cause for immediate dismissal. And AMI has set out the procedures for implementing the warning and dismissal policies. Therefore, AMI has gone beyond merely agreeing not to dismiss without just cause; it made specific promises to its employees not to dismiss without three warnings or just cause.

*Id.* Likewise, here, UVA laid out specific procedures for opening a Title IX investigation, investigating alleged misconduct, and disciplining and removing tenured faculty "for-cause." Accordingly, UVA made promises to its employees and is bound to keep them.

The cases cited by UVA are distinguishable. The disclaimer cases include express disclaimers. For example, the bylaws at issue in *Atta* included a provision stating, "bylaws and the rules and regulations do not create, nor shall be construed as creating as contract of any nature…." 2012 WL 178355, at *3. There is no similar disclaimer here. The *Jackson* case is distinguishable because Liberty University's Student Code of Conduct did not contain specific procedural guarantees like the policy at issue here. 2017 WL 3326972, at *7.[5] Rather it contains "mere aspirational statements of educational ideals." *Id.* "Such provisions are simply not the type of binding promises that the code of conduct established in *Thompson*, and they do not impose a legally enforceable obligation on [the employer]." *Johnston v. Speedway*, 2021 WL 1662725, *5 (W.D. Va. April 28, 2021).

---

[5] I acknowledge that Judge Moon noted that the student conduct code is not enforceable against the University if it is subject to unilateral changes by the University.

19

**F. Declaratory Judgment**

Finally, UVA argues that Plaintiff is not entitled to a declaratory judgment under 28

U.S.C. § 2201. However, in the context of the Complaint, Correa's request for a declaratory

judgment is part of his prayer for relief not an independent cause of action. This Court will not

dismiss particular remedies at the motion to dismiss stage. *See Charles v. Front Royal Volunteer*

*Fire & Rescue Dep't, Inc.*, 21 F. Supp. 3d 620, 629 (W.D. Va. 2014). Thus, UVA's motion to

dismiss Correa's request for a declaratory judgment is denied.

## CONCLUSION

For these reasons, Defendants' motion is granted as to Correa's claim for gender

discrimination under Title VII, his claim under the Virginia Human Rights Act, and his personal

capacity claims against Defendants Hutson and Smith. The motion to dismiss is otherwise

denied.

Entered:  July 22, 2025

*Robert S. Ballou*

Robert S. Ballou
United States District Judge