CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

June 18, 2026
LAURA A. AUSTIN, CLERK
BY:s/ KELLY BROWN
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| FELIPE CORREA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 3:24-cv-00065 |
| | ) | |
| v. | ) | |
| | ) | |
| THE RECTOR AND VISITORS OF THE | ) | By: Hon. Robert S. Ballou |
| UNIVERSITY OF VIRGINIA et al., | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

### <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Defendants' Motion for Summary Judgment, Dkt.

64. The motion is **GRANTED**.

### I.    Background

Plaintiff Felipe Correa, a former University of Virginia professor, alleges that Defendants

The Rector and Visitors of the University of Virginia, Malo A. Hutson, and Meredith Smith

discriminated against him in a Title IX proceeding in violation of Title VII, Title IX, the Equal

Protection Clause, and in breach of his employment contract. I dismissed Correa's claim for

gender discrimination under Title VII, his claim under the Virginia Human Rights Act, his

personal capacity claims against Hutson and Smith, and his request for damages under 42 U.S.C.

§ 1983. Dkts. 41, 42. The following facts are recited in the light most favorable to Correa.

In 2018, UVA hired Correa as a tenured member of the faculty and Chair of the

Department of Architecture within the School of Architecture. Dkt. 73 at 3. His faculty

appointment was "without term," Dkt. 73-2, meaning it could not be terminated except "for

adequate cause" pursuant to UVA's Policy on Disciplinary Suspension or Termination of

Academic Faculty ("For Cause Policy"), Dkt. 73-38. Correa's term as Department Chair, by contrast, was a fixed appointment set to conclude in July 2023. Dkt. 73 at 3–4.

The For Cause Policy requires faculty members facing possible termination to receive: (1) written notice of the charges and summary of the information supporting them; (2) an opportunity to meet with the responsible administrator to discuss the written notice of the charges; (3) an opportunity to have an advisory faculty panel review the charges; and (4) written notice of the provost's decision. Dkt. 73-38 at 3. An exception to the written notice requirement exists if the provost "determines that an immediate or interim suspension is justified to safeguard the University community or its operations from harm or disruption," in which case the faculty member may be suspended with pay before receiving written notice. *Id.*

In July 2021, Malo Hutson became Dean of the School of Architecture and, in turn, Correa's direct supervisor. Dkt. 65-3 at 19:1–19:9, 38:18–39:4. On March 2, 2022, Hutson asked Correa to step down from his position as Department Chair at the end of the semester. Dkt. 73 at 5. Hutson's stated reason was his desire to assemble a leadership team that would remain in place for his entire term as Dean. Dkt. 65-4 at 00:34–01:15. In exchange for this early departure, Hutson offered Correa a compensation package that included paid leave, research funding, summer wages, and the ability to teach classes of Correa's choosing upon his return. Dkts. 73 at 5, 73-8. Correa accepted the offer on March 5, 2022 and then notified faculty, staff, and students of his intention to step down as Chair and take academic leave. Dkts. 73 at 5–6, 73-9.

On March 23, 2022, three graduate students in the Architecture program requested a meeting with Hutson. Dkt. 73 at 6. In that meeting, two students made formal allegations of sexual misconduct against Correa. *Id.* First, John Doe alleged that Correa initiated a consensual sexual relationship with him after the two connected through Grindr, a dating application used by

2

the LGBTQ community. *See* Dkt. 73-11 at 2. According to Doe, he and Correa engaged in two sexual encounters in February and March 2021. *See id.* Doe subsequently ended the relationship. *See id.* Next, Jim Roe alleged that in June 2021, Correa made inappropriate physical advances by touching him repeatedly on the back, shoulders, and abdomen. *See id.* at 5. Roe further alleged that Correa had shown him academic favoritism before the advances and withdrew that favoritism after Roe rejected Correa's conduct. *See id.* at 5–6.

Hutson reported both allegations to UVA's Title IX Office on March 23, 2022. Dkts. 73 at 6, 73-11. On March 28, 2022, Provost Ian Baucom approved placing Correa on disciplinary suspension. Dkt. 73 at 6–7. The next day, Correa met with Hutson, Title IX Coordinator Meredith Smith, and Human Resources Representative Jennifer Harmon, and was placed on paid administrative leave pending investigation. *Id.* On March 31, 2022, Smith filed a formal complaint on behalf of Doe and Roe. Dkts. 73 at 8, 73-19.

The reports concerning Doe and Roe were compiled and incorporated into a formal Written Notice of Allegations and Investigation, which was issued to Correa on April 4, 2022. Dkts. 73 at 8, 73-20. The Notice listed the following alleged violations: (1) Quid Pro Quo Harassment (Title IX Prohibited Conduct); (2) Sexual Harassment (Title IX Prohibited Conduct); (3) Sexual and/or Gender-Based Hostile Environment Harassment (Sexual or Gender-Based Prohibited Conduct); (4) Faculty Conflict of Interest Policy; and (5) Provost Policy 033: Restrictions on Certain Romantic or Sexual Relationships. Dkt. 73-20 at 6–7.

The Notice further explained that UVA would investigate all potential violations of its policies under its Procedures for Investigating and Resolving Reports of Sexual and Gender-Based Misconduct ("Misconduct Procedures") and the Grievance Process for Investigating and Resolving Reports of Title IX Prohibited Conduct under the Policy on Sexual and Gender-Based

3

Harassment and Other Forms of Interpersonal Violence ("Grievance Process"). *Id.* at 7. Neither the Misconduct Procedures nor the Grievance Process mentions the For Cause Policy. Additionally, neither the Faculty Conflict of Interest Policy nor Provost Policy 033 specifies which procedural mechanisms govern alleged violations of the respective policies. Provost Policy 033 does, however, provide that "violating the prohibition with respect to undergraduate students shall be deemed misconduct as described in [the For Cause Policy]." Dkt. 73-22 at 5.

Because Doe's and Roe's allegations involved similar conduct over a fairly contemporaneous period toward parties known to each other, UVA consolidated the two complaints into one investigation and adjudicative proceeding. Dkt. 73 at 9. Correa objected to consolidation and requested that the complaints be investigated separately. *Id.* at 10. UVA denied this request, stating consolidation was justified based on the factual similarity of the complaints and administrative efficiency. *See* Dkts. 65-15 at 158:11–159:19, 73-31 at 133:18–134:9.

UVA retained outside attorney Amanda Ames to conduct the investigation. Dkt. 73 at 7, 10. Correa was notified of the investigation and allowed to identify witnesses for Ames to interview. *Id.* at 10. Correa declined to be interviewed by Ames, but Ames interviewed witnesses identified by him and others. *Id.* On December 9, 2022, Ames issued a draft investigation report. *Id.* at 10–11.; Dkt. 73-26. Correa was allowed to respond, and Ames incorporated a summary of Correa's response into her final report. Dkts. 73 at 11, 73-27 at 74–80.

Ames issued the final investigation report on June 9, 2023, making the following findings: *insufficient evidence* to support (1) Quid Pro Quo Harassment as to Doe and Roe, and (2) Sexual Harassment as to Doe only; and *sufficient evidence* to support: (1) Sexual and/or Gender-Based Hostile Environment Harassment as to Roe; (2) Faculty Conflict of Interest Policy as to Doe and Roe; and (3) Provost Policy 033 as to Doe only. Dkts. 73 at 11–12, 73-27 at 2. In

4

her report, Ames attached various exhibits, including a photograph of Correa's Grindr profile. *See* Dkts. 73-28 at 125:8–11, 65-17.

Following the investigation and pursuant to its Grievance Process, UVA scheduled a live hearing and hired attorney Christopher Tate to serve as the independent decisionmaker. Dkt. 73 at 12. Correa objected to Tate on bias grounds, arguing that Tate's prior service as Deputy Title IX Coordinator for UVA and his status as a UVA alumnus created an appearance of partiality. Dkt. 65 at 10. UVA rejected this objection, concluding that Tate satisfied the requirements of 34 C.F.R. § 106.45(b)(2), which requires that decisionmakers be free from conflicts of interest or bias for or against complainants or respondents generally. *Id.* at 10.

The hearing took place on September 5, 2023. Dkt. 73 at 12. Correa made opening and closing statements and conducted cross-examination of witnesses through his attorney-advisor, but he declined to provide testimony, answer questions, or submit to cross-examination. *Id.* At the hearing, Correa questioned Tate's authority under the Grievance Process to adjudicate potential violations of the Faculty Conflict of Interest Policy and Provost Policy 033. *Id.* at 12–13; Dkt. 73-32 at 21:21–23:10. While the March 2023 version of the Grievance Process permits a Title IX Coordinator to investigate violations of "any relevant policies (e.g., Faculty Conflicts of Interest Policy and PROV-033, Restrictions on Certain Romantic or Sexual Relationships at the University)," Dkt. 73-33 at 22, the version that Correa argues applies to his case only lists the Faculty Conflicts of Interest Policy and not Provost Policy 033, Dkt. 73-21 at 22. Tate rejected this argument, relying on the language from the March 2023 document. Dkt. 73-32 at 28:20–29:14.

After the hearing, on September 19, 2023, Tate issued a written Determination of Responsibility. Dkts. 73 at 13, 73-35. Tate concluded there was *insufficient evidence* to find

Correa responsible for (1) Quid Pro Quo Harassment as to Doe and Roe, (2) Sexual Harassment as to Doe, (3) Sexual and Gender-Based Hostile Environment Harassment as to Doe and Roe, and (4) Provost Policy 033 as to Roe; and *sufficient evidence* to find Correa responsible for (1) Sexual Harassment under Title IX as to Roe, (2) Faculty Conflict of Interest Policy as to Doe and Roe, and (3) Provost Policy 033 as to Doe. Dkts. 73 at 13–14, 73-35 at 1. In reaching the finding of responsibility for Sexual Harassment as to Roe, Tate reasoned that the touching of Roe's abdomen was "clearly sexual" in nature, making it more probable that the touching of Roe's back and shoulders was also sexual in character, particularly because Roe perceived Correa's physical contact as flirtatious. Dkts. 73 at 15, 73-35 at 12. Tate recommended the sanction of termination of employment. Dkts. 73 at 14, 73-35 at 2.

Correa appealed the written determination on October 10, 2023, raising three grounds: (1) procedural irregularities affected the outcome; (2) the Title IX Coordinator, Investigator, or Decision Maker had a bias or actual conflict of interest; and (3) the disciplinary sanction was inappropriate. Dkts. 73 at 16, 73-36. Under UVA's Grievance Process, Baucom served as the appellate officer. Dkt. 73 at 16; *see* Dkt. 73-21 at 37. Despite approving Correa's disciplinary suspension on March 28, 2022, Baucom did not recuse himself. Dkt. 73 at 16. Additionally, Correa alleges that Baucom requested that UVA's General Counsel draft the appeal decision letter on his behalf rather than drafting it himself. *Id.* at 16–17. Baucom, in turn, testified that the decisions were his, that counsel drafted the letter after Baucom shared his conclusions with him, and that he would have revised the draft. Dkt. 65-27 at 111:1–113:12. On December 1, 2023, Baucom issued a Final Outcome Letter upholding Tate's findings and conclusions. Dkts. 73 at 17, 73-37. Correa alleges that, in doing so, Baucom erred by relying on the same March 2023 version of the Grievance Process that Tate cited. Dkt. 73 at 17; *see* Dkt. 73-37 at 6–7. Correa was

immediately terminated following issuance of the appeal determination. Dkt. 73 at 17. At no

point did UVA invoke or follow its For Cause Policy. *Id.* at 18; Dkt. 73-15 at 84:14–85:8.

## II.    Standard of Review

Federal Rule of Civil Procedure 56 requires that the court "grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Once the movant properly makes and supports a motion

for summary judgment, the opposing party must show that a genuine dispute exists. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the

court views the facts in the light most favorable to the non-moving party. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the nonmoving party cannot defeat a properly

supported motion for summary judgment with mere conjecture and speculation. *See Glover v.*

*Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001). On the contrary, the court has an

"affirmative obligation" to "prevent 'factually unsupported claims and defenses' from

proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)

(quoting *Celotex Corp.*, 477 U.S. at 317).

## III.    Analysis

### A. Breach of Contract Claims

Correa brings breach of contract claims based on several alleged procedural deviations in

the investigation and the termination of his employment. In Virginia, a breach of contract claim

requires: (1) a legally enforceable obligation of the defendant; (2) the defendant's violation of

that obligation; and (3) injury to the plaintiff caused by the violation. *Filak v. George*, 594

7

S.E.2d 610, 614 (Va. 2004) (citations omitted).[1]

### 1. Failure to Apply the For Cause Policy

*First*, Correa argues that because his faculty appointment was "without term," UVA could only terminate him pursuant to its For Cause Policy for tenured faculty, and UVA improperly bypassed this policy in favor of the Title IX Grievance Process alone. UVA responds that the Grievance Process is the exclusive procedural mechanism whenever Title IX Prohibited Conduct is at issue and displaces the For Cause Policy entirely in such cases.[2]

The threshold question is whether UVA was obligated to follow both the Title IX Grievance Process and the For Cause Policy when it initiated disciplinary proceedings against Correa. Whether the two policies operate in parallel—as Correa argues—or whether the Grievance Process displaces the For Cause Policy when Title IX Prohibited Conduct is at issue— as UVA argues—is an issue of policy interpretation for the court. *See City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 628 S.E.2d 539, 541 (Va. 2006).

When interpreting contractual provisions, the court must "determine the parties' intention, which should be ascertained, whenever possible, from the language the parties employed in their agreement." *Pocahontas Min. Liab. Co. v. CNX Gas Co., LLC*, 666 S.E.2d 527, 531 (Va. 2008) (citations omitted). The court construes the policies together, giving effect to every provision where possible. *See Truell v. Regent Univ. Sch. of L.*, No. CIV.A.2:04 CV

---

[1] I previously found that UVA's Sexual Misconduct Policy, Grievance Process, Faculty Conflict of Interest Policy, Provost Policy 033, and For Cause Policy are incorporated into Correa's employment contract and are enforceable as such. *See Correa v. Rector & Visitors of Univ. of Virginia*, No. 3:24CV65, 2025 WL 2076480, at *11 (W.D. Va. July 23, 2025).

[2] UVA maintains two parallel procedures for addressing sexual misconduct allegations: the Grievance Process and the Misconduct Procedures. *See* Dkts. 65-11, 73-21. These two processes are substantively identical with respect to their investigative and adjudicatory steps. Accordingly, unless otherwise noted, I will refer to them collectively as the "Grievance Process."

716, 2005 WL 1926645, at *5 (E.D. Va. Aug. 5, 2005) (citations omitted); *Driscoll v. Hunter*, 716 S.E.2d 477, 480 (Va. Ct. App. 2011) (citation omitted). "Words that the parties used are normally given their usual, ordinary, and popular meaning." *D.C. McClain, Inc. v. Arlington Cnty.*, 452 S.E.2d 659, 662 (Va. 1995). Where two provisions appear to conflict, the more specific provision governs over the more general. *Levine v. Emps. Ins. Co. of Wausau*, 887 F.3d 623, 630 (4th Cir. 2018) (citing *Appalachian Reg'l Healthcare v. Cunningham*, 806 S.E.2d 380, 385 n.9 (Va. 2017)).

Here, the For Cause Policy states that it "govern[s] 'for-cause' disciplinary suspensions and terminations of academic faculty." Dkt. 73-38 at 2. It defines adequate cause to include "a clear level of professional incompetence, a serious breach of professional ethics or University policy, willful neglect of duty, or serious misconduct." *Id.* at 3. By its terms, the For Cause Policy is a general framework applicable to disciplinary terminations of academic faculty across a broad range of conduct. It does not address Title IX proceedings, does not contemplate a complainant, and does not specify how it interacts with any other UVA disciplinary policy.

The Grievance Process, by contrast, is specific in both its triggering conditions and its jurisdictional scope. It applies when UVA "receives a report alleging Title IX Prohibited Conduct by a Student or Employee" and is used "to respond to, investigate, and adjudicate any such allegations and to impose disciplinary sanctions against Students and Employees found responsible for violating the Sexual Misconduct Policy with regard to Title IX Prohibited Conduct." Dkt. 73-21 at 2.[3] Most significantly, when a formal Title IX complaint is filed,

---

[3] The Misconduct Procedures apply when UVA "receives a report alleging Sexual and Gender-Based Prohibited Conduct by a Student or Employee" and is used "to respond to, investigate, and adjudicate any such allegations and to impose disciplinary sanctions against Students and Employees found responsible for violating the Sexual Misconduct Policy with regard to Sexual and Gender-Based Prohibited Conduct." Dkt. 65-11 at 2.

"determinations about the merits of the allegations must be reached *only* by following the process set forth in this Grievance Process." *Id.* at 18 (emphasis added).

Correa's reading of the two policies as harmoniously applicable, with the Grievance Process governing the adjudication of responsibility and the For Cause Policy governing the termination of appointment, cannot be reconciled with the language of the Grievance Process. The word "only" is not the language of sequential procedure or shared jurisdiction but is the language of exclusivity. *Cf. Brooks v. Commonwealth*, 454 S.E.2d 3, 5 (Va. App. 1995) (interpreting "only" to explicitly and unambiguously limit the information required by statute). A policy mandating that determinations "must be reached only" by following its prescribed process forecloses the possibility of a competing procedural framework addressing the same conduct and the same determination. Had UVA intended the Grievance Process to operate alongside the For Cause Policy—with the For Cause procedures applying to the downstream employment consequence after the Grievance Process produced its findings—it could have said so. But UVA did not. Instead, it used language that forecloses precisely the kind of parallel operation Correa advocates for. Under Virginia law, courts must give effect to every word in a contract and may not adopt an interpretation that reduces a provision to surplusage. *Pocahontas Min. Liab. Co.*, 666 S.E.2d at 531 ("No word or phrase employed in a contract will be treated as meaningless if a reasonable meaning can be assigned to it, and there is a presumption that the contracting parties have not used words needlessly." (citations omitted)). Reading "only" to permit application of the For Cause Policy to allegations of sexual misconduct does exactly that, stripping the exclusivity clause of any operative effect. I decline to adopt that reading. To do so would create a separate investigative and adjudicative process in sexual misconduct cases for tenured faculty and no other faculty or staff at UVA. What's more, the Grievance Process forecloses Correa's

10

sequential model by covering not just the adjudicative determination but the full arc of the disciplinary proceeding through sanctions and appeal. *See* Dkt. 73-21 at 40 ("The Final Outcome Letter [from the Appeals Officers] is final under the Sexual Misconduct Policy and is not subject to further University appeal or grievance."). A process that claims jurisdiction over the entire disciplinary process does not leave a separate procedural space for the For Cause Policy to govern the employment consequence as a distinct matter.

In addition to the text of the policies, the federal regulatory framework under which the Grievance Process was adopted reinforces this conclusion. Title IX's implementing regulations require institutions receiving federal funding to maintain a grievance process that satisfies certain procedural requirements whenever Title IX Prohibited Conduct is alleged, including equitable procedural protections for both parties. *See* 34 C.F.R. § 106.45. These requirements are not optional, and an institution cannot substitute an alternative process when a Title IX complaint has been filed. Particularly relevant here is § 106.45(b)(1) of the 2020 Title IX regulations, which provides: "Any provisions, rules, or practices other than those required by this section that a recipient adopts as part of its grievance process for handling formal complaints of sexual harassment as defined in § 106.30, *must apply equally to both parties*." (emphasis added). But UVA's For Cause Policy applies only to faculty members, affording them certain procedural protections not available to student-complainants. Applying the For Cause Policy in parallel with the Grievance Process in this case would therefore afford Correa procedural protections unavailable to Doe and Roe, creating precisely the kind of structural asymmetry Title IX prohibits. *Cf. Rutgers v. AFSCME Loc. 888, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO*, 349 A.3d 369, 378–80 (N.J. 2026) (finding that an agreement affording arbitration rights only to the respondent conflicted with Title IX's mandate that both parties receive equal procedural

11

protections). Thus, the more natural textual reading is also the compliant reading.

Because the For Cause Policy yields to the Grievance Process under these circumstances, UVA was not obligated to follow the For Cause Policy's procedures in connection with Correa's termination, and its failure to do so is not a breach of contract.

### 2. Failure to Dismiss Doe's Sexual Harassment Charge

*Second*, Correa argues UVA failed to dismiss Doe's sexual harassment charge even though the alleged conduct was consensual and UVA's Sexual Misconduct Policy defines "sexual harassment" to include only unwelcome conduct. *See* Dkt. 73-39 at 11. Although Doe's complaint suggested a consensual sexual relationship and Ames found insufficient evidence of sexual harassment as to Doe after her investigation, the charge proceeded through the hearing.

Correa's theory fails as a matter of law. A breach-of-contract claim requires the plaintiff to identify a specific, mandatory contractual obligation that the defendant failed to perform. *Buck v. Jordan*, 508 S.E.2d 880, 884 (Va. 1998) (citation omitted); *Filak*, 594 S.E.2d at 614. While courts enforce procedural protections that an employer has expressly promised, they do not second-guess the employer's substantive disciplinary judgments unless the contract clearly removes discretion. *See Doe v. Wake Forest Univ.*, 671 F. Supp. 3d 624, 632 (M.D.N.C. 2023) ("Subjective or aspirational claims related to the overall fairness of the process and whether the hearing officer or others made mistakes of judgment in handling the claims against the Plaintiff, including the ultimate correctness of the decision to find Plaintiff responsible for misconduct and suspend him, are not enforceable identifiable objective contractual promises." (citation modified)).

Correa points to language in the Grievance Process providing that "[t]he Title IX Coordinator will evaluate the Formal Complaint to determine whether it constitutes Title IX

Prohibited Conduct. If the Title IX Coordinator determines that the Formal Complaint does not constitute Title IX Prohibited Conduct, Informal Resolution or Formal Resolution will not be available to the Complainant." Dkt. 73-21 at 14. Correa also cites the Notice of Allegations and Investigation, which states that UVA "shall dismiss a Formal Complaint when the alleged conduct, even if proved, would not constitute Prohibited Conduct as defined under the Sexual Misconduct Policy." Dkt. 73-20 at 11. Correa contends that because Doe's initial report did not allege that the sexual encounters were unwelcome or non-consensual, the alleged conduct—even if proved—could not constitute Prohibited Conduct under UVA's definition of sexual harassment, and dismissal was therefore mandatory.

Although Doe's initial report did not expressly allege that the sexual encounters were unwelcome, the Grievance Process does not require the Title IX Coordinator to dismiss a complaint simply because the complainant does not use the term "unwelcome" or explicitly assert non-consent. Determining whether the allegations, taken as true, could describe unwelcome conduct is a substantive evaluative judgment entrusted to the Coordinator, and neither the Grievance Process nor the Notice eliminates that discretion. *Cf. Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 690 (M.D. Tenn. 2018) (finding that the university's sexual misconduct policy "does not require that any particular evidentiary threshold be met" for the university to proceed with or terminate an investigation).

Here, the allegations were not so clearly outside the scope of the Sexual Misconduct Policy that the Coordinator lacked discretion to allow the matter to proceed. Doe's failure to expressly allege non-consent does not, by itself, render the alleged conduct incapable of constituting unwelcome behavior. Because the Grievance Process leaves room for the Coordinator to interpret the allegations and determine whether further investigation or

adjudication is appropriate, UVA's decision to proceed with the charge does not violate any mandatory procedural requirement.

### 3. Improper Consolidation

*Third*, Correa argues UVA erroneously consolidated the complaints of Doe and Roe into a single investigation and adjudication process when the 2020 Title IX regulations permit consolidation of complaints only where the allegations "arise out of the same facts or circumstances." 34 C.F.R. § 106.45(b)(4). Here, UVA's stated reasons for consolidation were the similarity of the conduct alleged, the fact that the alleged conduct occurred across a fairly contemporaneous period of time, and the fact that the parties knew each other and made initial reports at the same time.

As discussed above, Correa must identify a contractual obligation that UVA breached. The Title IX regulations do not impose a specific mandatory obligation but permit consolidating complaints where allegations "arise out of the same facts or circumstances." The regulation does not eliminate an institution's discretion in making such a determination, nor does it prescribe a methodology for doing so.[4]

In this case, UVA provided a reasonable basis for concluding that the two complaints shared factual overlap. It explained that the complaints involved similar conduct, occurred during a contemporaneous period, involved parties known to each other, and were reported at the same

---

[4] The Court's research only revealed one case criticizing a university's consolidation decision. In *Doe v. Texas Christian University*, TCU consolidated two parties' allegations against each other. The complainants "had been in a prior relationship and much of the evidence was applicable to both incidents." 601 F. Supp. 3d 78, 91 (N.D. Tex. 2022). Because "[t]he two incidents occurred over a month apart, in different cities, and they arise out of different facts and allegations," the court found that consolidation could not be justified based on the mere fact that the allegations were between the same parties. *Id.* at 91–92. However, the court did not analyze whether the consolidation rule created a contractual right; instead, it treated consolidation as a Title IX procedural irregularity relevant only to whether TCU acted with bias.

time. Additionally, both Doe and Roe were graduate students in the Architecture School, and both alleged that Correa extended academic favoritism or employment opportunities to them before withdrawing his favor after his advances were rejected or the sexual relationship ended. These considerations fall comfortably within the discretion afforded by the governing regulations. Correa's disagreement with UVA's assessment concerns UVA's substantive evaluation of the relationship between the complaints, not the violation of a mandatory procedural requirement.

### 4. Policy Notice Failures and Procedural Irregularities

*Fourth*, Correa argues UVA selectively implemented and failed to implement certain policies and procedures during the investigation and adjudication of the complaints against him.

Correa first contends that the Grievance Process in effect during his case did not expressly state that it applied to Provost Policy 033 or the Faculty Conflict of Interest Policy, and that UVA officials improperly relied on the March 2023 revision of the Grievance Process—which did reference Provost Policy 033—without notifying him of the change. Importantly, Tate and Baucom cited the March 2023 Grievance Process to determine that the Grievance Process could be used to adjudicate Provost Policy 033 violations and that reports involving different policies could be consolidated under the Grievance Process.

This argument fails because Correa has not identified any contractual provision prohibiting UVA from using the Grievance Process to investigate alleged violations of other UVA policies. Nothing in the Grievance Process, For Cause Policy, or any other policy limits UVA to using the Grievance Process only for policies expressly enumerated within it. In fact, the Grievance Process that Correa cites provides that when a report of Title IX Prohibited Conduct "also implicates other forms of discriminatory and/or harassing conduct" or violations of "any

15

relevant policies," the Title IX Coordinator may investigate the allegations together. Dkt. 73-21 at 22. The phrase "any relevant policies," coupled with the use of "e.g.," makes clear that any enumerated policies are illustrative rather than exhaustive. *See Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 960 (4th Cir. 2025) (citations omitted); *FTC v. EDebitPay, LLC*, 695 F.3d 938, 943–44 (9th Cir. 2012). By authorizing a single investigation and specifying that, in such cases, "the investigation and resolution will be conducted in accordance with the Grievance Process," Dkt. 73-21 at 22, the policy grants UVA broad discretion to fold additional policy violations into the Grievance Process when they arise from the same underlying facts. UVA's decision to adjudicate alleged violations of Provost Policy 033 and the Faculty Conflict of Interest Policy using the Grievance Process therefore does not constitute breach.[5]

Correa next asserts that because Provost Policy 033 and the Faculty Conflict of Interest Policy do not specify the mechanism for investigating alleged violations, UVA lacked authority to use the Grievance Process. This argument is unpersuasive for the same reasons. When a policy is silent as to the investigative mechanism, the university retains discretion to select an appropriate process, so long as it does not violate a mandatory procedural requirement.

Finally, Correa argues that Tate improperly relied on the 2022 Faculty Conflict of Interest Policy, which states in relevant part: "It is also the responsibility of faculty members to avoid engaging in sexual relationships with or making sexual overtures to students over whom they are in a position of authority by virtue of their specific teaching, research, or administrative assignments." Dkt. 73-23 at 1. In his written determination, Tate concluded that Correa engaged

---

[5] The question of which version applies is unresolved, and UVA does not explain why the March 2023 version was operative at the time of investigation and adjudication. In any event, even if Correa's version of the Grievance Process governed, it does not contain language forbidding UVA from using the Grievance Process to evaluate violations of Provost Policy 033.

in a sexual relationship with Doe while he was in a position of authority over Doe and that he made sexual overtures to Roe while he was in a position of authority over Roe. Dkt. 73-35 at 20–21. However, the 2024 version of the Faculty Conflict of Interest Policy does not contain the language above, and Correa argues that by removing this language, UVA "tacitly acknowledg[ed] that it was subsumed by, and duplicative of, Provost Policy 033." Dkt. 73 at 26.

This argument fails for several independent reasons. First, Tate correctly relied on the 2022 Faculty Conflict of Interest Policy. He issued his written determination in 2023, and the 2024 version of the policy did not exist at any point during the conduct, investigation, or adjudication. Because the 2022 policy was the operative version at all times, Tate properly relied on it. Second, Correa's core inference—that UVA's removal of the relevant language in 2024 constitutes a tacit acknowledgment that it was subsumed by Provost 033—is completely speculative. Correa offers no evidence that UVA's later revision of the policy reflects a concession that the earlier version was improper or should not have been applied. Finally, Tate's interpretation and application of the 2022 policy is a substantive disciplinary judgment, not a procedural obligation. Correa identifies no contractual promise that Tate violated by interpreting the policy as he did.

For these reasons, Correa's arguments concerning procedural irregularities do not create a genuine dispute of material fact.

### 5. Appellate Officer Conflict

*Fifth*, Correa argues UVA violated its obligation to ensure a fair and impartial investigative process and avoid conflicts of interest or bias when Baucom served as the appeals officer and when he requested that UVA counsel draft the decision letter instead of doing so himself.

17

Correa identifies no provision in the Grievance Process or any other policy that prohibits an administrator from serving as an appeals officer merely because he previously approved an interim measure such as disciplinary suspension.[6] Absent such a requirement, Baucom's prior approval of an interim suspension does not constitute breach. Likewise, Correa identifies no contractual provision prohibiting an appeals officer from delegating the drafting process to UVA counsel. Institutions routinely rely on counsel to assist in preparing disciplinary decisions. Without a concrete contractual obligation, Correa's concerns about bias or conflicts of interest cannot support a breach-of-contract claim.

### B. Title VII Claim

Correa brings a Title VII claim alleging that UVA intentionally discriminated against him based on sexual orientation by disciplining him more harshly than similarly situated heterosexual male professors accused of sexual misconduct. UVA moves for summary judgment on the grounds that Correa has not produced evidence in support of a prima facie case of sexual orientation discrimination.

A plaintiff may establish intentional discrimination through direct or circumstantial evidence, or the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Nichols v. Comcast Cablevision of Maryland*, 84 F. Supp. 2d 642, 648 (D. Md.), *aff'd*, 217 F.3d 840 (4th Cir. 2000). To establish a prima facie case of discriminatory treatment under *McDonnell Douglas*, a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Maryland Ct. of*

---

[6] The Grievance Process appears to contemplate potential conflicts of interest by prohibiting the Title IX Coordinator, the investigator assigned to investigate the complaint, and the decision maker from serving as the appeals officer. *See* Dkt. 73-21 at 4.

*Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012). The fourth element requires that comparators be "similar in all relevant respects," meaning that they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citations omitted); *see also Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019).

Here, Correa identifies two heterosexual male professors he contends were treated more favorably, neither of whom qualifies as similarly situated for purposes of his disparate treatment claim.

Correa first relies on a chart documenting sexual misconduct cases at UVA from 2020 to 2024. *See* Dkt. 73-7. The respondent in one case, identified as "CB," was a male professor accused by a female undergraduate student of quid pro quo harassment, sexual harassment, and hostile-environment harassment. *Id.* According to the chart, CB was found responsible[7] and suspended for one year without pay. *Id.* Correa thus argues that CB received a less severe sanction despite being found responsible for more serious violations. However, CB fails as a comparator in several ways. First, while the chart lists the genders of the respondent and complainant, it does not specify each person's sexual orientation, so I cannot conclude that CB is a proper comparator. The chart also contains no information about the nature of the allegations, the underlying factual findings, the decisionmakers involved, or the circumstances of the

---

[7] Deputy Title IX Coordinator and Director of Investigations Charlotte Breen testified that the "Recommended Responsibility" column of the chart indicates "there was a finding of responsibility present" but does not necessarily mean the respondent was found "responsible for all of the allegations of prohibited conduct." Dkt. 73-24 at 75:16–21. It therefore remains unclear whether CB was found responsible for all three charges.

disciplinary process. Without such details, no reasonable jury could determine that CB is similarly situated to Correa in any relevant respect or that CB's conduct was more serious than Correa's conduct. *See Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." (citation omitted)). Finally, the chart reflects a range of outcomes across cases involving both same-sex and different-sex respondents and complainants, including an instance where a same-sex respondent was found not responsible for the alleged misconduct. On this record, Correa's comparator showing rests on speculation rather than evidence.

Correa's second comparator is a department head accused of repeated sexual assaults who was permitted to remain in his position during the investigation and ultimately resigned after a review panel recommended termination. *See Doe v. Univ. of Virginia*, No. 3:23-CV-00018, 2024 WL 4796179 (W.D. Va. Nov. 14, 2024).[8] On the developed record, UVA has identified undisputed, material differences between Correa and the respondent in *Doe*. First, the *Doe* respondent worked in a different school, reported to a different supervisor, and was recommended for termination by a review panel. When different decisionmakers are involved in a disciplinary determination, the decisions "are rarely similarly situated in all relevant respects." *Hurst v. D.C.*, 681 F. App'x 186, 193 (4th Cir. 2017) (citations omitted); *see also Haywood*, 387 F. App'x at 359–60 (finding that the comparator at issue was not similarly situated to plaintiffs

---

[8] I previously addressed this comparator at the motion to dismiss stage, finding that the similarities between Doe and Correa were sufficient to raise a plausible inference of discriminatory treatment. That ruling, however, was made under the more permissive pleading standard of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), which required only that Correa's allegations be facially plausible. At the summary judgment stage, Correa must come forward with specific, admissible evidence sufficient to create a genuine dispute of material fact—not merely plausible allegations. *Celotex Corp.*, 477 U.S. at 324.

where they belonged to separate job families, had different responsibilities, operated at different grade levels, and shared different supervisors). Additionally, the *Doe* respondent was subject to a materially different set of governing policies. The Sexual Misconduct Policy applicable to his proceedings predated the 2020 Title IX regulations, which substantially restructured how universities must investigate and adjudicate sexual misconduct complaints by introducing live hearing requirements, cross-examination rights, and written determination procedures. Further, the circumstances surrounding the sanction distinguish the two cases. The respondent in *Doe* was on sabbatical during the investigation, UVA was operating remotely due to the COVID-19 pandemic, and the complainant graduated before in-person instruction resumed. *Doe*, 2024 WL 4796179, at *6. These factors eliminated or substantially reduced the ongoing risk that typically supports immediate suspension or termination. Finally, while "a plaintiff may raise an inference of discrimination where a similarly situated individual was permitted to resign but the plaintiff was terminated," *Green v. iMentor, Inc.*, No. CV RDB-24-2567, 2025 WL 2299432, at *12 (D. Md. Aug. 8, 2025) (citation omitted). The facts do not support such an inference here. The *Doe* respondent resigned two days after a termination recommendation was issued, and UVA subsequently barred him from all future employment and volunteer roles and disqualified him from emeritus status. *Doe*, 2024 WL 4796179, at *2. Correa also testified that he never attempted to resign during or after the disciplinary process. Dkt. 65-6 at 136:17–21. The undisputed record thus establishes material differences between Correa and the *Doe* respondent.

Because Correa has not produced facts from which a jury could infer disparate treatment, he cannot establish a prima facie case of discrimination.

### C. Title IX Claim

In support of his Title IX claim, Correa argues that UVA "committed procedural errors and drew adverse inferences against [him] based on his status as a gay male" and "demonstrated

bias against [him] through every phase of the disciplinary proceedings." Dkt. 73 at 33. UVA responds that it acted consistently with its Grievance Process and that there is no evidence it was motivated by Correa's sexual orientation.

Title IX prohibits federally supported educational institutions from discriminating on the basis of sex. 20 U.S.C. § 1681(a). To survive summary judgment on a Title IX claim, a plaintiff must produce evidence from which a reasonable jury could conclude his sexual orientation was a "but-for" cause of the challenged disciplinary action. *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236–37 (4th Cir. 2021); *see also Ortegel v. Va. Polytechnic Inst. & State Univ.*, No. 7:22-CV-00510, 2026 WL 1073631, at *11 (W.D. Va. Apr. 17, 2026). A plaintiff may rely on procedural irregularities, statements made by university officials, or other circumstantial evidence suggesting that bias influenced the outcome. *See, e.g.*, *Doe v. Univ. of Virginia*, 668 F. Supp. 3d 448, 456–57 (W.D. Va. 2023); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585 (E.D. Va. 2018).

In addition to UVA's alleged procedural failures, Correa identifies several events that he argues permit a reasonable jury to infer that UVA's process was influenced by bias. First, Correa points to Ames's inclusion of his Grindr profile picture in the investigative record. According to Correa, there was no dispute that Correa and Doe met on the app, and the image had no apparent evidentiary purpose. Second, Correa notes that Hutson told Ames during the investigation that Correa's Grindr app had once been open in a classroom, which made a student uncomfortable. Correa argues this comment was irrelevant to the allegations and served only to cast him in a negative light based on his sexual orientation. Third, Correa challenges Tate's conclusion that his touching of Roe's abdomen was "clearly sexual," which made it more likely that his touching of Roe's shoulder and back was also sexual. Correa argues that Tate's inference relied on a

22

stereotype that physical contact by a gay man toward another man is inherently flirtatious or sexual. Fourth, Correa argues that Tate improperly relied on an alleged "pattern" of misconduct involving multiple complainants, even though only two individuals came forward and one stated that all physical contact was consensual.

Taken together, these examples do not permit a reasonable inference that UVA's actions were motivated by sex-based animus. Correa's Grindr profile supported Doe's testimony that he did not know Correa was affiliated with UVA when they met on the app, and Correa has not explained how and why Ames's inclusion of the profile was prejudicial. Nor has Correa explained why Hutson's statement about Correa's Grindr use was prejudicial or should not have been included in the investigative report. Similarly, there is no evidence that Tate's conclusions were motivated by bias. Physical touching of a person's abdomen could be perceived as sexual regardless of the parties' sexual orientations, and while Tate's finding of a pattern of misconduct may be erroneous, it does not appear to be discriminatory.

Ultimately, none of the alleged statements or conclusions explicitly address sex or sexual orientation, and Correa's allegations of bias are equally compatible with nondiscriminatory explanations. *Compare Ortegel*, 2026 WL 1073631, at *12 (crediting a statement "emphasiz[ing] men in discussions of consent"), *with Metzger v. Rector & Visitors of Univ. of Virginia*, No. 3:23-CV-58, 2024 WL 4357236, at *6 (W.D. Va. Sept. 30, 2024) (refusing to infer gender discrimination from a letter stating that plaintiff "is passionate about teaching and essentially can't help herself from diving into scholarship in this area"). Viewing the evidence in the light most favorable to Correa, no reasonable jury could conclude that UVA's investigators or decisionmakers acted based on stereotypes about gay men.

### D. Equal Protection Claim

Correa's equal protection claim brought under 42 U.S.C. § 1983 relies on the same facts

as his Title VII and Title IX claims and largely fails for the same reasons.[9]

To establish an equal protection violation, Correa must show that he was treated differently from similarly situated individuals and that the differential treatment was motivated by discriminatory intent. *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017) (citation omitted). For the reasons already discussed in connection with Correa's Title VII and Title IX claims, the record does not contain evidence from which a reasonable jury could conclude that a similarly situated heterosexual professor engaged in comparable misconduct and was treated more favorably. Correa's comparator evidence fails to demonstrate that he was similarly situated to CB or the *Doe* respondent, and even if he was similarly situated, the asserted indicators of bias are insufficient to support a finding of discriminatory animus. The evidence therefore does not permit a reasonable inference of purposeful discrimination.

**IV.     Conclusion**

For the reasons above, Defendant's Motion for Summary Judgment (Dkt. 64) is **GRANTED**. All claims are **DISMISSED** with prejudice.

Entered:  June 18, 2026

*Robert S. Ballou*

Robert S. Ballou
United States District Judge

---

[9] The Eleventh Amendment generally bars suits against state agencies, including public universities. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)). UVA is therefore immune from Correa's equal protection claim brought under § 1983. While Correa's requests for prospective injunctive relief against Hutson and Smith are not barred under the *Ex parte Young* exception, his claim nonetheless fails on the merits.